## THE BALTIMORE- PERMANENT BUILDING AND LAND SOCIETY OF BALTIMORE CITY *vs.* LEVI F. SMITH.

*Parol Evidence—Written Contract—Action by Vendee for breach of Contract for Sale of land—Parol evidence inadmissible to Vary the terms of the Contract—Construction of the Contract touching the Quantity agreed to be sold—Meaning of the word "about"—Measure of damages.*

There is no rule of law which is better settled or more inflexible than that which excludes parol evidence offered to vary or contradict the terms of a written contract.

An action was brought by the vendee against the vendor for the breach of a written contract for the sale of a parcel of land described as S's island, "containing *about sixty-five acres.*" At the trial it was proven that the tract contained only thirty to thirty-six acres, and parol evidence was offered by the plaintiff, the purpose of which was to prove a sale of sixty-five acres, and also to prove representations made by the vendor, that the number of acres contained in the parcel sold, was at least sixty-five, and that such representations induced the vendee to sign the contract. On objection it was HELD:

1st. That the vendee must stand or fall upon the terms of the written paper, and it was not competent for him to set up by parol another and different contract from that on which he had declared.

2nd. That the force of the qualifying word "*about*" was simply, that while the parties did not bind themselves to the precise quantity of sixty-five acres, it imported that the actual quantity was a near approximation to that mentioned, that is to say, within a fraction of an acre, or perhaps it might cover a discrepancy of one or two acres.

3rd. That it could not be construed to mean that the parties were contracting without regard to the area, or that the vendee took the risk with regard to the quantity.

4th. That its character and position, the mode in which it was occupied, and the purposes for which it was contemplated to be used, as shown by the evidence, precluded the idea that it was a pur-

chase in gross, without regard to quantity, and that the contract could be performed by conveying about half the number of acres mentioned in the contract.

5th. .That the contract was to be construed as an agreement to sell and convey land containing sixty-five acres, with no other qualification than such slight variation as might be found in ·its actual measurement.

6th. That the vendee was not bound to accept a conveyance of thirty or thirty-six acres.

7th. That the measure of damages for the breach of the contract was the sum paid by the plaintiff on account of the purchase money, with interest in the discretion of the jury, and such sums as the jury might find the plaintiff paid for travelling and board expenses whilst attending to the execution and fulfilment of said contract, and also such reasonable sum as the jury might find the plaintiff was entitled to, for the services of counsel in advising him in reference to the execution of said contract, and investigating the title to the land mentioned in said agreement, and nominal damages for not conveying said land.

8th. That the plaintiff was not prevented from recovering for the money paid counsel for investigating the title, by the fact, that such expenses were incurred by him after he was notified of the deficiency in the quantity of the land.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

*First Exception.*—At the trial the plaintiff being asked " had you any means of knowing the market value of this property on the 14th of April, 1877? (the date of the breach of the contract,) replied that he knew what it was worth to him from contracts he had made to sell parts of it; one of said contracts was made on the 7th of March.

Thereupon the counsel for the plaintiff examined the witness as to the contract, and he testified that on the 7th of March, 1877, he contracted to sell an undivided

fourth interest in the Solomon's Island land, of sixty-five acres, to one R. D. Wilson, of Belvidere, Warren County, N. J., for $12,500, to be paid in four instalments, the first on the 19th of April, 1877, and the rest within one year from 7th of March; to the admission of said contract, and the testimony of the witness in relation thereto, the defendant objected, but the Court overruled the objection, and permitted the same to go to the jury. The defendant excepted.

*Second Exception.*—The plaintiff further proved by R. D. Wilson, a competent witness, that he resided in Belvidere, Warren County, New Jersey; has known the plaintiff since November, 1876, and is the person mentioned as having made a contract of purchase of one-fourth interest in Solomon's Island, which was shown him; and he also testified, subject to exception, that when he made the contract, he had the means to pay $12,500 in twelve months for one-fourth interest in this property; he was able to make the payments, and had the means to fulfil the contract; when he made the agreement with Smith, it was made with the understanding that they were to go into a company for the purpose of improving the property; the first improvement was a large hotel; they were going to make a summer resort of it like Fair Haven, or some other resorts; in furtherance of this intention, they went and examined some buildings at the Centennial, there being a sale of quite a number of these buildings at that time, as for instance, " The Globe Hotel;" he went to attend the sale of that hotel, it being intended to erect it at Solomon's Island, and that it was on that occasion he got notice that Mr. Smith could not comply with the contract with him; the hotel was a large one, close to the Centennial, and the material was sold to be removed; it was sold the day he was there, and was purchased by a gentlemen, who expected to go in with him, for $3000 or $4000; it was on the 28th of March when

he was notified by Smith that he could not carry out his contract; witness had had other business transactions with Mr. Smith before this one, and they had other business transactions pending at the time he went into this.

The witness was then asked, "please state to the jury what means you took to inform yourself of the actual or prospective value of Solomon's Island, which induced you to go into the purchase?" And testified, subject to exception, that after Mr. Smith presented the matter to witness, Mr. Smith showed him quite a number of letters he had received from others about the property, and showed him a map containing the location of it; witness then put himself in communication with some parties; he had difficulty in getting some parties who knew of the island; he had a friend in Washington City who was quite an operator, and he wrote to him.

The counsel for plaintiff then asked "what kind of an investigation, if any, did you make, before entering into this contract?" and witness answered, subject to defendant's exception, that he wrote to a gentlemen in Washington City, William Davis, to whom he had been referred by the congressman of witness' district, as a person who could give him information. Besides that, he had conversations with several men from Baltimore, with reference to the Drum Point Railroad going to the island, and from information thus obtained, and the representations made to him by Mr. Smith, and the letters to Smith, which witness had seen, he was satisfied to go into the operation. He could not now recall the names of the persons from Baltimore with whom he talked; he had seen their names on the register of the Girard House, where he was stopping at the time, and had been introduced to them; it was more particularly about the Drum Point Road and its prospects, that he talked with them.

Witness was then asked to state to the jury, what caused him to contemplate this investment as likely to be

a profitable one; and answered that it was on account of the terminus of the Drum Point Railroad; the terminus of the road was to be at this island, where the improvements at the end of the road would be. To all which testimony, from the answer to the question "Please state what means you took to inform yourself of the actual or prospective value of Solomon's Island, which induced you to go into the purchase?" to the end of the answer to the last question, the defendant objected; but the Court overruled its objection, and permitted the same to go to the jury. The defendant excepted.

*Third Exception.*—The plaintiff offered the two following prayers:

1. That if the jury find the contract of sale offered in evidence, and that at the time said contract was made, and before the signature thereof by the plaintiff, the agent of the defendant made the representations as to the number of acres of land testified to by him, and by the witness Robinson, and that plaintiff signed said contract upon the faith of said representation, and that the quantity of land was deemed by both contracting parties to be an essential ingredient in the purchase; and if they further find the payment by the plaintiff of the cash payment of $500 mentioned in said contract, and the tender by him of the $4500, required to be paid on the 14th April, 1877, and that the defendant at that time failed or refused to deliver to him a deed for any greater number of acres than about thirty acres, then the plaintiff is entitled to recover on the second count in this action.

2. That if the jury find for the plaintiff under the plaintiff's first instruction, the measure of damages is the amount the jury may find that the plaintiff paid to the defendant under said contract, with interest, as the jury may allow, and the personal expenses they may find that plaintiff reasonably incurred in and about the performance by him of his part of said contract, including

such fees to his professional adviser in the premises, for services rendered after the execution of said contract, as the jury may believe to have been reasonable. And also the difference between the price agreed to be paid for the land by the plaintiff, and the actual market value thereof on the 14th day of April, 1877, and in ascertaining the market value of said land at that date, the jury are entitled to consider any circumstances existing at the time, established to their satisfaction, which tended to affect the market price of said property on that day.

And the defendant offered the nine prayers following:

1. That if the jury shall find from the execution of the agreement between the plaintiff and defendant, dated on the 16th day of February, 1877, offered in evidence in this case, then the jury are instructed that by the true construction of said agreement, the quantity of land did not enter into the essence of said agreement, and the plaintiff took upon himself the risk of the number of acres of land contained in the parcel mentioned in said agreement, and was therefore bound to complete said contract by the acceptance of a deed for as much land as the part of the island mentioned in said agreement contained, subject to the exceptions therein referred to, and to pay the cash, to wit, $4500, and execute a mortgage for $7000, as set forth in said agreement, and if the jury find that the said plaintiff refused to comply with said contract, at the time fixed by its terms, to wit, the 14th day of April, 1877, then the defendant was entitled to treat said contract or agreement as rescinded, and the plaintiff can only recover the sum of five hundred dollars paid by him on or about the 16th day of February, 1877, with interest, in the discretion of the jury.

2. That if the jury shall believe from the evidence that the defendant entered into the contract with the plaintiff, to convey to him about sixty-five acres of land, known as "Part of Solomon's Island," and shall further find that

it was not able to convey to him about sixty-five acres of land at the time required by said contract; and shall further find, that after it had entered into said contract, the said defendant discovered that there was a large deficiency in the quantity of land, of which it immediately notified the plaintiff, and in consequence of such deficiency the plaintiff refused to carry out said agreement according to its terms, and shall further believe that the non-execution of said agreement on the part of the defendant, was occasioned simply by its honest inability to make title to about sixty-five acres of land, and the consequent refusal of the plaintiff to accept a deed for so much land as was contained in the deed from Philip M. Snowden, trustee, offered in evidence, then the plaintiff is only entitled to recover in this action the sum of five hundred dollars, paid by the plaintiff on account of the purchase money, on the 16th day of February, 1877, with interest in the discretion of the jury, and such sums as the jury may find the plaintiff paid for travelling and board expenses whilst attending to the execution and fulfilment of said contract, and also such reasonable sum as the jury may find the plaintiff is entitled to for the services of counsel, in advising him in reference to the execution of said contract, and investigating the title to the land mentioned in said agreement, and nominal damages for not conveying said land ; but if the jury find that the plaintiff did not employ any counsel to investigate the title to said land, until after he was notified that said land did not contain about sixty-five acres of land, then they shall not allow as damages any sum for the expenses of investigating the title to said land.

3. That by the true construction of the agreement between the plaintiff and defendant, offered in evidence in this case, the defendant was not bound to convey to the plaintiff the exact amount of sixty-five acres of land, but only the quantity of land containing about sixty-five

acres, and known as a part of Solomon's Island, which was purchased by the defendant from Philip M. Snowden, trustee, except eight or nine small lots leased by Solomon, as set forth in said agreement; and shall further find, that the plaintiff tendered to the defendant the sum of forty-five hundred dollars, and coupled with such tender a demand for a deed for sixty-five acres of land, and refused to accept a deed for the land described in the said deed from Snowden, trustee, and to execute to the defendant a mortgage for $7000, as required by said agreement, then such tender was insufficient in law, and the defendant has committed no breach of its contract to convey, and the plaintiff is not therefore entitled to recover in this action. (The Court refuses this prayer, not because of a dissent from the construction of the contract given in it, but because there is evidence to go to the jury that the quantity named was of the essence of the contract, and because the quantity of land tendered, being only thirty-six acres, it is not in compliance with the contract to convey " about sixty-five acres.")

4. That all the testimony given by Levi F. Smith, in relation to representations made, as to the number of acres contained in the part of Solomon's Island, mentioned in the agreement in evidence in this case, and also the testimony of D. Clint Robinson as to representations made at and before the time of signing the agreement for sale, and also the testimony of Wilton Snowden, as to representations made to Smith & Robinson, be, and the same are hereby excluded from the consideration of the jury.

5. That if the jury shall believe from the evidence, that before the plaintiff employed counsel to examine the title to the land in this case, he knew that there were less than sixty-five acres of land in the part of the island mentioned in said agreement, then the plaintiff is not entitled to recover anything for the costs of such an examination.

6. That all the evidence in relation to a contract with a certain R. D. Wilson, as given by Levi F. Smith, and the whole of the testimony of R. D. Wilson in relation to such contract, and also as to his means and ability be, and the same is hereby excluded from the consideration of the jury.

7. That unless the jury shall believe from the evidence, that the contract for sale from Smith to Wilson was made in good faith, and that Wilson was a person able and willing to pay the sum which he agreed to pay for it, then the jury shall not consider the same as any evidence of value in ascertaining the price or value of said land on the 14th day of April, 1877.

8. That if the jury find for the plaintiff in this case, in estimating the value of the land mentioned in the agreement in this case, they shall not value the same by the acre, but only in gross, taking into consideration the improvements upon the property.

9. That if the jury shall believe from the evidence in this case, that the plaintiff was notified, before he made the alleged contract with R. D. Wilson, that there were not "about sixty-five acres of land" contained in the land mentioned in said agreement, then they shall not consider the alleged contract any evidence in estimating the value of said land on the 14th day of April, 1877.

The Court, (DOBBIN, J.,) granted the first and second prayers of the plaintiff, and rejected all of the defendant's except the seventh, which it granted.

The defendant excepted, and the verdict and judgment being against it, appealed.

The cause was argued before BARTOL, C. J., BRENT, GRASON, MILLER, ROBINSON, and IRVING, J.

*Samuel Snowden* and *S. Teackle Wallis,* for the appellant.

*Charles Marshall,* for the appellee.

BARTOL, C. J., delivered the opinion of the Court.

This is an action instituted by the appellee, for the breach of a contract made with him by the appellant, for the sale of a parcel of land. The contract is dated February 16th, 1877. The property which is the subject-matter of the contract, is therein described as "all that property situate and lying in Calvert County, Md., containing about sixty-five acres, being a part of the property known as 'Solomon's Island,' and which was purchased by said Land Society from Philip M. Snowden, trustee, under a decree passed by the Circuit Court for Calvert County, in equity, in the case of the Baltimore Permament Building and Land Society against Isaac Solomon and Wife, except eight or nine small lots, since sold by it, which lots were mentioned in leases made by said Solomon, after the mortgage given by him to said Society."

The consideration or price to be paid by the appellee was $12,000, "to wit, $500 in cash, $4500 on or before the 14th day of April 1877, and the balance, to wit, $7000, to be paid in two years from the date hereof, to be secured by mortgage on the property hereby agreed to be sold, with interest payable semi-annually." The cash payment of $500 was made.

By the covenants of the parties a deed was to be made by the vendor on payment of $4500, as stipulated, and a mortgage executed by the purchaser to secure $7000, the balance of the purchase money.

It was "agreed that the title to the property was good and clear of all incumbrances."

The contract was signed by the appellee at the office of his attorney in Philadelphia. He had never seen the property and asked Wilton Snowden, (secretary) who represented the appellant, for a plat. When the secretary

returned to Baltimore, "he wrote to the agent of the company for a plat made by Mr. Grover, in 1872. The agent replied, he would have the plat in a few days;" on the 6th of March, the secretary received a letter and the plat; on seeing it, he discovered a considerable discrepancy between the number of acres mentioned in the contract, and that shown on the map. He soon after notified Mr. Beman in Baltimore, (who had a written agreement with the appellee, dated February 13th, for one-half interest in the purchase,) showed him the plat and requested him to inform the appellee of the discrepancy, which Beman did by letter, the same day. Beman's letter was dated March 13th, and received by appellee the following day, when, as he testifies, he first heard that there were less than sixty-five acres of land.

On the 17th of March, appellee went to Baltimore, started thence, on the night of the 18th, to visit the island, in company with Beman and Wilton Snowden; returned to Baltimore on the evening of the 19th, and went to Philadelphia the same night. Saw nothing more of the company till the 14th day of April, when he tendered $4500, and demanded a conveyance of sixty-five acres. The answer was that "*they had not got it, could not do it,*" or words to that effect, "that they had not the land." Snowden testifies that "appellee demanded *sixty-five acres*, declined to accept the deed and execute the mortgage, because there was not sixty-five acres of land, he wished a proposition, the company offered to abate $2000 for the deficiency, which was declined, invited a proposition from him, which he declined to make. Then the company said they were willing to pay back the $500, and cancel the agreement. About two months afterwards the $500 was tendered to him in Philadelphia, which he declined to accept."

It appears, that on the 21st day of March preceding, an abstract of title was sent to the appellee, by the secre-

tary, which with the plat was placed by him in the hands of Mr. Robinson, his attorney, who under his instructions, went to Calvert County on the 7th day of April, and made a careful and thorough examination of the title, which proved satisfactory. Mr. Robinson states that the only objection was the deficiency of land. He states that "he was not sent down to examine the title, till after the appellee knew, and he knew that the quantity of acres was deficient."

On the 10th day of August 1877, the following letter was sent to the appellee, and received the following day:

"Baltimore, 10 Aug. 1877.
"Levi F. Smith, Esq.

"Dear sir: I write to announce to you, that by a survey of Solomon's Island, made by order of the board of directors of this Society, and completed a few days ago, there were found 48.08 acres in the entire island. After deducting lots sold and leased previous to the agreement with you, there were found thirty-six acres.

"Yours truly,
"Wilton Snowden.
"Secretary."

The suit was instituted on the 27th day of November 1877.

The declaration contained *two* counts, to the first the defendant demurred, and the demurrer was sustained. On this ruling no question has been raised. The case was tried below, on the issue joined upon the plea to the *second* count. This count sets out substantially the contract, and alleges a breach by the appellant in failing and refusing to execute and deliver a deed conveying about sixty-five acres of land; claims damages for this breach, and also special damage, for expense and trouble incurred by the plaintiff, and for moneys expended by him for

legal advice and counsel in the investigation of the title, &c.

The first exception · to be considered, is that taken to the parol evidence offered by the plaintiff, of the representations by Snowden as to the number of acres, made before and at the time the contract was signed. This is found in the testimony of *Smith,* (the plaintiff,) *Robinson* and *Snowden,* which was admitted subject to exception, and the appellant, by its *fourth prayer,* asked to be excluded as inadmissible, because it tended to contradict, alter, or explain the terms of the written contract.

This testimony is as follows:

*Smith,* (the appellee,) stated "that he informed Snowden that. Beman had represented that the company had seventy acres of land on the island. Mr. Snowden then proceeded to write the contract as it now appears, and then read it to witness, when witness heard him read *' about sixty-five acres '* he said to Mr. Snowden seventy acres is what the property was represented to me to contain.' " Mr. Snowden replied "that there was more than sixty-five acres, but that as he was a little uncertain about the amount of land contained in the eight or nine small lots, which are excepted from the sale, he had written the area down at sixty-five acres, so as to be sure that the company could deliver at least that number; he assured witness that there were at least sixty-five acres, and rather more than less than that number. On the 16th day of February, Mr. Wilton Snowden came to the office of witness in Philadelphia having the contract with him; Mr. Robinson, witness's counsel was present and he read the paper over; when he came to the words *' about sixty-five acres '* he asked Mr. Snowden what was meant by *' about,'* and Mr. Snowden assured Mr. Robinson that there were more than sixty-five acres, but that they put it sixty-five, so as to be sure they could deliver it; after this explanation, witness under the advice of Mr. Robinson

signed the contract, and paid the $500, which Mr. Snowden wrote the receipt for, &c."

The testimony of Robinson is to the same effect. Snowden testifies, " At the time of signing the agreement in Philadelphia, Smith made some reference to the number of acres, and witness told him at that time, that it was the impression of the directors that there were about sixty-seven or sixty-eight acres of land ; the original deeds all through, and the mortgage to the company called for eighty acres of land, from which there were leased, as we supposed, twelve or thirteen acres, and witness stated to him that he thought sixty-five acres was a proper figure to put it at ; and he thinks he gave Mr. Robinson the same response."

There is no rule of law better settled or more inflexible, than that which excludes parol evidence which is offered to vary or contradict the terms of a written contract. The rule on this subject is distinctly stated in *Rice vs. Forsyth,* 41 *Md.,* 402, as follows: " It is a cardinal rule that parol or extrinsic evidence is inadmissible to add to, contradict or vary the terms of a written contract. It may be admitted to ascertain and make certain the parties and subject-matter of an agreement, to apply the contract to its subject, to prove any collateral independent fact about which the written agreement is silent, and to remove latent ambiguities. In such case it is used not to contradict or vary the written instrument, but to uphold and enforce it as it stands." It is sometimes a matter of some nicety to determine whether in a particular case, the parol evidence offered falls within the general rule, and few subjects have given rise to more difficult and perplexing questions for decision. In cases of latent ambiguity, parol extrinsic evidence is always admissible to remove such ambiguity, so that the contract may be applied to the subject-matter. Cases of this kind have no application here, and need not be cited. Sometimes the parol evidence is

offered to prove some collateral, independent fact, or agreement between the parties about which the written contract is silent; in such case it is admissible.

· Examples of the application of this rule are found in *McCreary vs. McCreary*, 5 *G. & J.*, 147; *Creamer vs. Stephenson*, 15 *Md.*, 221; *Basshor vs. Forbes*, 36 *Md.*, 154. Many other cases might be cited; among them may be classed *Erskine vs. Adeane*, *L. R.*, 8 *Chy. Appeals*, 756, 765, 766, cited by appellee, who contends that the present case falls within the same class. A brief recurrence to the terms of the written contract, and the parol evidence clearly shows that this contention cannot be supported.

· The written contract in terms stipulates for the sale of a parcel of land, described as part of Solomon's Island, containing *about sixty-five acres*. The purpose of the parol testimony is to prove a sale of sixty-five acres of land, without qualifying words, and also to prove representations made by the agent of the vendor, that the number of acres contained in the parcel sold, was at least sixty-five, and that such representations induced the appellee to sign the contract. Now this testimony cannot be said to relate to an independent collateral fact; on the contrary, it refers to the very subject-matter embraced in the writing, to wit: the quantity or number of acres; and its effect is to bind the appellant absolutely to convey at least sixty-five acres; whereas in the writing such a stipulation is not found, unless indeed such is the true meaning and construction of the writing, in which case the parol testimony has no significance; but of this we shall speak hereafter. It is difficult to understand why the effect of the parol testimony, if it have any effect, is not to add to or vary the terms of the written contract. If the latter had contained nothing about quantity, or, the number of acres had been mentioned with the strongest words of qualification, such as "*be the same more or less*"

the objection to the admissibility of the parol evidence would be perhaps more obvious, but certainly would rest upon no other principle or reason than that which exists in the present case. The legal question would be the same.

In dealing with this proposition, it is important to bear in mind the nature of this proceeding, and the pleadings in the case. Here the suit is on the written contract. In another form of proceeding, if for instance, the suit were by the vendor to enforce the contract, and the purchaser were defending upon the ground of fraud, or mistake or misrepresentation as to quantity, whereby he was induced to enter into the contract, the parol evidence would be clearly admissible. But such is not the nature of the case; the appellee does not impeach the validity of the written contract, but has declared upon it as binding, and seeks to recover damages for its breach by the appellant. No fraud or misrepresentation is alleged, nor could it be, in the form of action selected. In such case the appellee must stand or fall upon the terms of the written paper, and it is not competent for him to set up by parol another and different contract from that on which he has declared. *Watchman & Bratt vs. Crook,* 5 *G. & J.,* 239; *Kribbs vs. Jones,* 44 *Md.,* 397. And this objection applies with special force in a case like the present where the contract is within the Statute of Frauds and required to be in writing. *Taney vs. Bachtell,* 9 *Gill,* 205.

For these reasons we are of opinion the parol evidence referred to was inadmissible, and there was error in refusing the *appellant's fourth prayer,* which asked that it be excluded, and for the same reasons the *first prayer* of the appellee was erroneously granted, which referred to the parol evidence, and made it a part of the hypothesis of the prayer.

The next question arises upon the construction of the written contract, upon which alone depends the appellee's right to maintain the suit.

By the first prayer of the appellant the Court was asked to instruct the jury, " that by the true construction of the agreement, the quantity of land did not enter into the essence of the agreement, and the plaintiff took upon himself the risk of the number of acres contained in the parcel mentioned in the agreement, and was therefore bound to complete the contract, by the acceptance of a deed for as much land as the part of the island mentioned actually contained, subject to the exceptions therein referred to. * * * And after his refusal to do so, the plaintiff was entitled to treat the contract as rescinded, and the plaintiff can only recover the sum of $500, paid by him, with interest at the discretion of the jury."

The proof shows that the part of the island embraced in the contract of sale comprised in fact only from thirty to thirty-six acres, for the evidence differs as to this. The largest number as stated in the survey made at the instance of the appellant is thirty-six acres. The question therefore is whether a contract to convey "*about sixty-five* acres" can be performed by conveying thirty-six acres, and this turns upon the meaning or construction of the word " *about*" as it appears in the writing.

The general rule as stated in *Marbury vs. Stonestreet*, 1 *Md.*, 147, is, where land is sold and the number of acres is stated, that quantity. is of the essence of the contract, or forms a material consideration with the purchaser, whether the sale be for a gross sum or by the acre, unless there is something in the terms of the contract to show the contrary.

Where the sale is for a gross sum, and there are qualifying words used such as "*more or less,*" or equivalent expressions, they have been held to import that quantity does not enter into the essence of the contract. *Stebbins vs. Eddy*, 4 *Mason*, 419; *Jones vs. Plater*, 2 *Gill*, 128; *Stull vs. Hurtt*, 9 *Gill*, 446; *Hall vs. Mayhew*, 15 *Md.*, 551; *Slothower vs. Gordon*, 23 *Md.*, 9; *Tyson vs. Hardesty*, 29

*Md.*, 305. But what is the force and effect of the qualifying words "*about sixty-five acres*" in this contract? Does it import that quantity was not a material part of the contract? and can the Court so declare as a conclusion of law?

We think not. The force of the qualifying word, we think, is simply that while the parties do not bind themselves to the precise quantity of sixty-five acres, it imports that the actual quantity is a near approximation to that mentioned, that is to say, within a fraction of an acre, or perhaps it might cover a discrepancy of one or two acres.

It cannot be construed to mean that the parties were contracting without regard to the area, or that the appellee took the risk with regard to the quantity. He was not acquainted with the property, had never seen it. Its character and position, the mode in which it was occupied, and the purposes for which it was contemplated to be used, as shown by the evidence, preclude the idea that it was a purchase in gross without regard to quantity, and that the contract could be performed by conveying about half the number of acres mentioned in the contract. Thirty or thirty-six acres cannot be construed to be about sixty-five acres. In *Bourne vs. Seymour*, 16 *C. B.*, 336, (31 *E. C. L.*,) a contract for the sale of "*about five hundred tons nitrate of soda*" was construed to be a contract for the sale of *five hundred tons*, with such exception by the word "*about*" as the variance usually found to exist in such cases, arising from some little difference in the mode of weighing, and that it was not performed by delivering four hundred tons.

So in this case we construe the contract to be an agreement to sell and convey land containing sixty-five acres, with no other qualifications than such slight variation as might be found in its actual measuremeant. The appellee was not bound to accept a conveyance of thirty or thirty-six acres. The first prayer of the appellant was properly refused.

The next question to be considered is the measure of damages, and in deciding this question we shall dispose of that raised by the appellant's exception to the evidence with reference to the contract of sale by the appellee to R. D. Wilson referred to in the sixth prayer of the appellant.

By granting the *second prayer* of the appellee the jury were instructed that "the measure of damages is the amount they may find the plaintiff paid to the defendant under the contract, with interest as the jury may allow, and the personal expenses they may find the plaintiff reasonably incurred in and about the performance by him of the contract, including such fees to his professional adviser in the premises, for services rendered after the execution of the contract, as the jury may believe to have been reasonable. And also the difference between the price agreed to be paid for the land by the plaintiff, and the actual market value thereof on the 14th day of April, 1877; and in ascertaining the market value of the land at that date, the jury are entitled to consider any circumstances existing at the time, established to their satisfaction, which tended to affect the market price of the property on that day."

The general rule in case of a breach of contract of sale by a vendor, is to award such damages to the purchaser as will place him so far as money can do it, in the same position he would have occupied, if the contract had been fulfilled. *Engle vs. Fitch, L. R.*, 3 *Q. B.*, 330. "When contracts for the sale of chattels are broken by the vendor failing to deliver the property according to the terms of the bargain, it seems to be well settled as a general rule both in England and the United States, that the measure of damages, is the difference between the contract price and the market value of the article at the time when it should be delivered." * * * * * * *Sedgwick on the Measure of Damages*, 313, (6th *Ed.*) On page 315, the

author remarks, "it will be observed, that in laying down this rule, the analogies of real estate are departed from, and the price paid or the consideration money is not considered conclusive, but that the actual value is inquired into." In the case of a breach of a contract to convey land, a different rule was established in England at a very early day. In *Flurean vs. Thornhill,* 2 *Wm. Bl.,* 1078, the purchaser was denied all profit for the loss of his bargain.

The law is thus stated by Sugden: "If the purchaser declare on the common money counts, he of course cannot obtain any damages for the loss of his bargain; and even if he affirm the agreement by bringing an action for the non-performance of it, he will obtain nominal damages only for the loss of his bargain; because a purchaser is not entitled to any compensation for the fancied goodness of his bargain, which he may suppose he has lost, where the vendor is without fraud, incapable of making a title." *Vendors and Purchasers,* 358, (*14th Eng. Ed.*)

The learned author cites *Flurean vs. Thornhill,* and a number of other decisions. Although that case has been sometimes criticised, and perhaps departed from in some degree by *Hopkins vs. Grazebrook,* 6 *B. & Cres.,* 31, which in the opinion of Sugden cannot be reconciled with it, yet he says "it is much too late to impeach the authority of that case, which, moreover, was properly decided." It has been followed in a great number of cases; among them may be cited, *Hadley vs. Roxendale,* 9 *Exch.,* 341; *Walker vs. Moore,* 10 *B. & C.,* 416, 422; *Worthington vs. Warrington,* 8 *C. B.,* 134; *Pounsett vs. Fuller,* 17 *C. B.,* 660; *Sikes vs. Wilde,* 1 *B. & S.,* 687, and 4 *B. & S.,* 421; *Bain vs. Fothergill, L. R.,* (6 *Exch.,*) 59; *Engel vs. Fitch, L. R.,* (3 *Q. B.,*) 314.

The rule in England as deduced from the decided cases is thus stated in 2 *Addison on Contracts, sec.* 529: "If

the vendor had reasonable ground for believing that he was the owner of the property, and had the right to sell at the time he agreed to sell, but is prevented by an unexpected defect of title from completing his engagements, and is ready to do all that he possibly can to fulfil the contract, the purchaser will only be entitled to recover nominal damages, together with his deposit (if a deposit was paid) with interest, and the expenses he has incurred in investigating the title and searching for judgments."

In *Hammond vs. Hannin,* 21 *Mich.*, 374, the cases in the United States are collected and reviewed by Judge COOLEY in an able opinion, and the following conclusions are stated, as the rule of damages: " If the vendor acts in bad faith,—as if having title he refuses to convey, or disables himself from conveying,—the proper measure of damages is the value of the land at the time of the breach; the rule in such case being the same in relation to real as to personal property. But on the other hand, if the contract of sale was made in good faith, and the vendor for any reason is unable to perform it, and is guilty of no fraud, the clear weight of authority is that the vendee is limited in his recovery to the consideration money (paid) and interest, with perhaps in addition, the costs of investigating the title."

Many cases are cited by the learned Judge in support of these propositions, some of which are referred to in the appellant's brief.

Mr. Sedgwick also states this as the rule generally followed in this country as well as in England. And the same rule applies where the inability to perform the contract proceeds from a deficiency in the quantity of land, unknown to the vendor without his fault, as where it proceeds from a defect in the title.

This question does not appear to have arisen, or been decided in this State.

*Cannell vs. M'Clean,* 6 *H. & J.,* 297, was an action on a bond, conditioned for the conveyance of land; the purchase money was paid, and the condition of the bond being broken, the Court of Appeals held, reversing the judgment of the County Court, "that the value of the land at the time of the breach of the contract was the measure of damages."

In that case, so far as appears in the report, the question of good faith on the part of the vendor was not raised. There was no evidence of his inability to convey, or excuse or explanation for his failure to perform his contract.

So far as appears the breach of the bond was a wilful act on his part, and the Court laid down the same rule of damages, as applicable to contracts respecting personal property. We do not question the correctness of that decision or mean to depart from it; in our judgment, the rule there adopted has no application to a case like the present.

In *Dyer vs. Dorsey,* 1 *G. & J.,* 440, there was a contract by the vendor, that a deed should be executed to the purchaser by third persons, who held an outstanding title; the contract being broken, a suit was brought thereon by the purchaser, and the Court decided that "the sum of money which it might be necessary to pay for obtaining the outstanding title was the true measure of damages."

In *Marshall vs. Haney,* 9 *Gill,* 251, the Court held that the time at which the breach occurred was the period at which the value of the lands should be estimated in assessing damages. (p. 260.) This was said with reference to the *second* breach, which charged that the defendant, after making the contract, had conveyed a part of the lands to another person.

In *Rawlings vs. Adams,* 7 *Md.,* 26, (51,) it was held that the rule adopted in *Cannell vs. M'Clean* in regard to the measure of damages could not be applied to the case then under consideration.

We need not refer particularly to the facts of that case, or to those of *Clagett vs. Easterday,* 42 *Md.,* 617, as they furnish no analogy to the present. In the case last cited, the general rule was stated as in *Cannell vs. M'Clean,* but under the circumstances of the case, it was held that the rental value of the land was the proper measure of damages.

In none of these cases was the particular question decided, which is here presented.

That is to say, what is the true measure of damages, where the vendor has acted in good faith, and without fault, and is unable to convey the land, from causes beyond his control, and which he could not with reasonable diligence foresee. That is the case presented by the *second prayer* of the appellant; which in our judgment states the rule of damages correctly, and ought to have been granted; except for the last part of it, which denies to the appellee the right to recover for money paid counsel, for investigating the title, if such expenses were incurred by him after he was notified of the deficiency in the quantity. This part of the prayer we think was erroneous, and there was no error in refusing it. The appellee was not bound to be governed by such notice, but was entitled to go on and ascertain the facts for himself, both as to the state of the title and the number of acres contained in the island. It appears, moreover, that it was not till the 10th day of August, 1877, that specific notice was given to him of the actual area of the island, which was long after he had incurred the expense of investigating the title.

It follows from what has been said, that there was error in the ruling of the Court below in the *first* and *second bills* of exception, and in granting the *first* and *second* prayers of the appellee, and refusing the *fourth* and *sixth* prayers of the appellant.

The appellant's *third* prayer was correctly refused for the reason stated by the Judge of the Superior Court.

> *Judgment reversed, and*
> *new trial ordered.*