# UNITED STATES OF AMERICA

*vs.*

## EDWIN W. POE ET AL., RECEIVERS OF THE UNITED SURETY COMPANY.

*Discharge of Surety—Alteration of Contract—Consent of Receivers—Authority of Court.*

Where a contract for dredging a channel to a named depth and width was four years later modified by a contract which extended the limits of the channel to be dredged and expressly contemplated an increase in the amount of material to be removed, *held* that this involved such an alteration of the original contract as to discharge the surety on the earlier contract, although this latter in terms recognized the possibility of its subsequent modification.     pp. 476-480

Where the surety on a government contract was in the hands of receivers when a supplemental contract, calling for additional work, was entered into, the court could authorize the receivers to consent to the new contract, or could decline to permit them to do so, in which latter event the government could either require other security, or could decline to give the new contract to that contractor.     p. 479

*Decided May 5th, 1921.*

Appeal from the Circuit Court of Baltimore City (HEUISLER, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Samuel K. Dennis, Special Assistant United States Attorney,* with whom was *Robert R. Carman, United States Attorney,* on the brief, for the appellant.

*Robert W. Williams,* with whom were *Stuart S. Janney* and *Janney, Stuart & Ober* on the brief, for the appellees.

Boyd, C. J., delivered the opinion of the court.

This is one of several appeals heard at the present term of this Court, which were taken from orders of the lower court refusing to allow certain claims of creditors of the United Surety Company of Baltimore, which was placed in the hands of receivers on January 13th, 1911. This claim was made by the United States of America, and is for the amount of the penalty of a bond ($42,000) given by the Midland Land & Improvement Company on August 13th, 1907, with the United Surety Company as surety, for the performance of a contract made by it with the United States for dredging in Newark Bay and Passaic River, N. J. A similar bond was entered into the same day by the Bankers Surety Company in the penalty of $58,000. The contract was dated the 12th of August, 1907, and was entered into on behalf of the United States by Col. D. W. Lockwood, Corps of Engineers, U. S. Army.

Another contract was made on August 3rd, 1911, between the Midland Land & Improvement Company and the United States, represented by Col. Wm. T. Russel, Corps of Engineers, and the appellees contend that that contract was an alteration of the one in 1907 of a material kind, and, as it was not consented to by the United Surety Company, or by them as receivers, that company was discharged from all liability on the bond. The auditor so held, and disallowed the claim of the United States, and the lower court having overruled exceptions taken to the auditor's report in reference to said claim, this appeal was taken.

The advertisement for bids for the original contract was for "Proposals for dredging in Newark Bay and Passaic River, N. J.," and there were a number of specifications. Amongst them was one that "it is understood and agreed that the quantities given in these specifications are approximate only." One of the "special conditions" was that the River and Harbor Act, approved March 2, 1907, contains the following provision:

"Improving channel in Newark Bay and Passaic River, New Jersey, in accordance with the report submitted in House Document Numbered Four Hundred and Forty-one, Fifty-ninth Congress, second session, two hundred thousand dollars: Provided that the Secretary of War may enter into a contract or contracts for such materials and work as may be necessary for the prosecution of said work, to an amount not exceeding in the aggregate six hundred and fifty thousand dollars, to be appropriated for, from time to time, according to law, in addition to the amounts herein and heretofore appropriated."

Under the head of "Description of Work" is the following:

"The work to be done under these specifications consists in dredging a channel as above authorized 16 feet in depth at mean low water through Newark Bay and Passaic River from Staten Island Sound to the Montclair and Greenwood Lake Railroad bridge, a distance of 10.8 miles. The width of this channel to be 300 feet to the Nairn Linoleum Works, a distance of 9.7 miles; thence 200 feet in width 1.1 miles, to the Montclair and Greenwood Lake Railroad bridge.

"Depth, Side Slopes and Tides: Under the project of June 13, 1902, a channel is in progress 200 feet wide throughout the reach to be improved. This channel is to be 12 feet deep to the Nairn Linoleum Works and 10 feet deep above that point, and of the 10.8 miles to be dredged, about 8 miles from Newark Bay up have been completed; and the entire channel will be completed under certain contracts now in force and in progress. There are no natural depths in the river in excess of those to be dredged under the project of 1902. The minimum depths in the river on either side of this channel are from 6 to 8 feet up to the vicinity of the Nairn Linoleum Works and about 4 feet above that locality.

"The depth required is sixteen (16) feet at mean low water; an allowance of one (1) foot for overdepth in dredging will be made."

In the contract it was provided:

"That in conformity with the advertisement and specifications hereunto attached, which form a part of this contract, the said Colonel D. W. Lockwood, Corps of Engineers, for and in behalf of the United States of America, and the said Midland Land and Improvement Company, do covenant and agree, to and with each other, as follows:

"That the said party of the second part shall furnish the necessary labor and plant, and dredge about four million, one hundred and seventy-seven thousand, one hundred and ten (4,177,110) cubic yards of material, scow measurement, in Newark Bay and Passaic River, N. J., and that the said party of the second part shall be paid therefor at the rate of sixteen and one-quarter (16¼) cents per cubic yard, scow measurement, amounting to about $678,780.38 for all material which shall have been satisfactorily removed and disposed of."

The agreement also contains the following provision in reference to a change or modification of the contract:

"If, at any time during the prosecution of the work, it be found advantageous or necessary to make any change or modification in the project, and this change or modification should involve such change in the specifications as to character and quantity, whether of labor or material, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices of both material and labor thus substituted, for those named in the original contract, and before taking effect must be approved by the Secre-

tary of War:  Provided, that no payment shall be
made unless such supplemental or modified agreement
was signed and approved before the obligation arising
from such modification was incurred."

The supplemental agreement was dated the 3rd of August,
1911.  The recitals in it state as reasons for modifying the
contract of August 12, 1907, that since it was entered into
requests have been made by interested parties

"for the removal of a shoal in the Passaic River on the
south side of the present lines of the work now being
done under said contract and in the vicinity of Lister's
Chemical Works, between the Pennsylvania freight
bridge and the Jackson Street highway bridge," and
that in the River and Harbor Act, approved February
27, 1911, it is provided "that the project for the im-
provement of the Passaic River below the Montclair
and Greenwood Lake Railroad bridge may, in the dis-
cretion of the Secretary of War, be so modified as to
allow the widening of the channel of the river at
bends wherever considered desirable in the interest of
commerce and navigation, and provided also that no
additional work shall be done under this authority
which will increase the total cost of the project * * *
under which project the work embraced in the present
contract dated August 12, 1907, is being prosecuted";
and that the Midland Land and Improvement Com-
pany "has offered to do the additional amount of dredg-
ing required to widen the channel of the Passaic River
in the vicinity of Lister's Chemical Works, and at
any other bends in the river where considered desirable
in the interest of commerce and navigation, at the
same rate provided for in said contract of August 12,
1907, * * *  Now, therefore, the said contract is on
this 3rd day of August, 1911, hereby modified in the
following particulars, but in no others:

"That the said contractor, the Midland Land and
Improvement Company, shall do the additional dredg-
ing required to widen the channel in the Passaic River

on the south side of the present lines of the work now
being done under said contract in the vicinity of Lis-
ter's Chemical Works, between the Pennsylvania Rail-
road freight bridge and the Jackson Street highway
bridge, and at any other bends in the river below the
Montclair and Greenwood Lake Railroad bridge where
considered desirable in the interest of commerce and
navigation and where required by the contracting offi-
cer, and to lines to be indicated by the contracting
officer in each case: Provided, that the total quantity
of material to be removed under the contract dated
August 12, 1907, above referred to, and this supple-
mental agreement, shall not exceed the quantity stated
in said contract (4,177,110 cubic yards) by more than
10 per cent.

"That the said contractor shall be paid therefor at
the rate of sixteen and one-quarter cents (16¼) per
cubic yard, scow measurement, for all material that
shall have been satisfactorily removed and disposed of."

It is shown by a report from the District Engineer Officer
to the Chief of Engineers that the contract, including the sup-
plemental contract, was annulled by the Chief of Engineers
on March 12, 1913. At that time the total yardage removed
by the Midland Company under the original contract was
3,021,681 and under the supplemental contract 131,951, be-
ing a total of 3,153,632 yards. Under the contract of Octo-
ber 10, 1913, Eugene Breymann agreed to "do all the dredg-
ing remaining to be done to complete the improvement in
Passaic River, N. J., estimated at 1,155,429 cubic yards of
material, based on scow measurement," but Breymann
dredged, according to the statement in the claim of the United
States, 1,328,257 cubic yards. Breymann completed the bal-
ance of the work under his contract on November 30, 1915,
and the United States attorney, with leave of the court, filed
a supplemental statement of its claim as follows:

"Cost to remove 1,328,257 yards under sec-
    ond contract at 26⅞c. per yard........$356,969.05
Amount it would have cost to remove that
    at 16¼ c. .......................... 215,841.76

    Excess of cost....................$141,127.29
Cost of advertising and printing in relet-
    ting second contract................      42.05

    Total excess cost.................$141,169.34
Forfeited retained percentage amounting
    to................................  33,998.17

    Net loss to U. S..................$107,171.17."

Another statement made by the auditor of the War De-
partment showing the Midland Company's account may be
thus summarized:

"Net payment to that company...........$478,467.05
Net payments to Breymann............. 356,969.05
Advertising and printing...............      42.05

    Total debits. .....................$835,478.15
Material dredged prior to de-
    fault, 3,153,362 cubic yards
    at contract price, 16¼c. per
    cubic yard. ..............$512,465.20
Material dredged by Breymann
    in completing the work, 1,-
    328,257 cubic yards at 16¼c.
    per cubic yard............ 215,841.76
                      728,306.96

    Amount due U. S..................$107,171.19.

The bond of the United Surety Company refers to the con-
tract of August 12th, 1907, and the condition was:

"Now, therefore, if the above bounden Midland Land and Improvement Company shall and will, in all respects duly and fully observe and perform all and singular the covenants, conditions, and agreements in and by the said contract agreed and covenanted by said Midland Land and Improvement Company to be observed and performed according to the true intent and meaning of the said contract, and as well during any period of extension of said contract that may be granted on the part of the United States as during the original term of the same," etc.

That contract was for *about* 4,177,110 cubic yards, while the supplemental contract provided that the total amount of material to be removed should not exceed the above amount by more than ten per cent. The Midland Company is charged in the account with 4,481,899 cubic yards, being 304,779 more than the amount named in the original agreement. It is contended by the attorneys for the appellant that there was no actual difference as to the amount between the original and the supplemental contract, as ten per cent. is the customary allowance, long recognized by the Comptroller of the Treasury and contractors on such work as proper margins for variations. The only witness examined on that point answered by saying that that was explained best by a copy of a letter from the office of the Chief of Engineers dated September 24, 1898. It is said in that letter that the term "more or less" is "not to be considered as authorizing any material change in the approximate quantities given," and again: " 'more or less' is considered to be introduced to allow for errors in estimates and not to cover except where otherwise specially provided an increase or decrease to exceed ten per cent. of approximate quantities on which bid is made," but the writer went on to say:

"The approximate quantities named in a bid must have an important bearing on the price submitted, and to change them after making contracts is a radical change of the terms of contracts not permitted by the

UNITED STATES *vs.* POE.

law, and in many cases unjust to other bidders. If new conditions require without question radical changes in quantities or other essential elements in the terms of a contract, such changes must be provided for by supplemental contracts. Supplemental contracts are not considered desirable and will be recommended for approval only in cases of most evident necessity," etc.

Whether or not "more or less" and "about" are to be construed in the same way, we need not discuss, but in *Baltimore Perm. Bldg. Soc.* v. *Smith*, 54 Md. 187, this Court held, in reference to land, that in an expression of "about 65 acres" the word "about" "imports that the actual quantity was a near approximation to that mentioned, that is to say, within a fraction of an acre, or perhaps it might cover a discrepancy of one or two acres."

Of course we realize that it would be extremely difficult, if not impossible, to do more than these specifications did, where it is said that the quantities given "are approximate only," but by the original contract the Midland Company agreed to dredge "about 4,177,110" cubic yards, and, if the letter above referred to as to the ten per cent. was to govern, then the Midland Company would have been entitled to a decrease, not exceeding ten per cent., if less than the 4,177,110 cubic yards were included in the description of the space to be dredged, given in the specifications. Of course it could not have been required under the original contract to have dredged more cubic yards than were included in the spaces given in the specifications. But by the new contract it undertook to do additional dredging required to widen the channel in the vicinity of Lister's Chemical Works and at any other bends in the river below the bridge "provided that the total quantity of material to be removed under the contract dated August 12, 1907, and this supplemental agreement shall not exceed the quantity in said contract (4,177,110 cubic yards) by more than ten per cent." The supplemental agreement, therefore, not only did not relieve it of anything required by

the original contract, but added to it, as it was thereby bound to all it had originally agreed to do, plus the additional dredging required by the supplemental contract.

It is not very clear as to what number of cubic yards were included in the dredging done under the first contract of the Midland Company. It is shown that the Midland Company dredged 3,153,632 and that Breymann completed the *contracts* of the Midland Company by dredging 1,328,257 cubic yards—the two amounting to 4,481,889. It is not shown how much, if any, of those dredged by Breymann was outside of the original contract, but we know that 131,951 cubic yards credited to the Midland Company were outside of the original contract. Therefore, it only took 4,349,938 to complete the original contract, even if we assume that all that Breymann did was within the bounds of that contract (which is by no means certain). If the Midland Company had dredged the 131,951 yards under the original contract it would have made a difference of about $14,000 and of course the difference is still greater if any part of what was paid to Breymann was for work outside of the limits of the original contract.

The Midland Company is charged with the difference between what it agreed to do the dredging for (16¼c), and what was paid Breymann (26⅞c) and hence if the supplemental contract had not been made, and the Midland Company had done the amount of work on the original contract which it did on the supplemental contract, the liability of the United Surety Company would have been that much less. The appellant claims that, as it gave the Midland Company credit for the 131,951, which it said was easier work, the Midland Company was benefited to that extent and not injured, but if the surety company could not without its consent be made responsible under its bonds for anything outside of the contract of 1907, it would seem clear that the supplemental contract did actually increase its liability to that extent at least.

As the total dredging under the contract of 1907 only amounted to 4,349,938 cubic yards, and the supplemental contract required the Midland Company to dredge 4,594,821 yards, if demanded, its liability was increased by the latter to the extent of 244,883 cubic yards, even under the appellants' claim that the increase up to ten per cent. was authorized under the original contract, for it could not be contended that the Midland Company was under that contract required to do more than what was necessary to complete what it then undertook to do. The price contracted for by the Midland Company was evidently a very low one, as it was much less than the estimate of the government and very much less than Breymann's contract, who was the lowest bidder when it was given to him.

We have thus far spoken more particularly of the number of cubic yards named in the original contract, but there is much force in the position, taken by the appellees, that the contract was really simply to dredge a defined space in Newark Bay and Passaic River from Staten Island Sound to the Montclair and Greenwood Lake Railroad bridge, a distance of 10.8 miles—the width and depth of the channel being given in feet and the distance in miles. The specifications provided that "if it is found that any material has been dredged from any point below or outside the limits given for work, unless authorized by the engineer, the amount of such material shall be deducted from the total amount dredged before final acceptance of the work." In the letter of the District Engineer to the Chief Engineer of October 5, 1915, as to the quantity of material to be dredged under the contract with Breymann and locality of dredging yet to be done, it was said that the intention of making the original contract with the Midland Company was that dredging should be done from the 16-foot contour in Newark Bay to the Montclair and Greenwood Railroad Bridge. "The yardage covered by the contract was the estimated quantity to be removed to give a channel of project dimensions between the points mentioned."

So the Midland Company was confined to the limits given, and if it dredged as agreed within those limits it could not have been required to dredge any more, even if the amount was much less than the number of cubic yards named in the contract, but the supplemental contract is different. The representatives of the government recognized the great change made by the latter. We have seen above what the Chief Engineer said as to when such contracts should be made—"if new conditions require without question, radical changes in quantities or other essential elements in the terms of a contract." In the statement of account made by the Auditor of the War Department and filed in this case it is said: "As the provisions of the supplemental contract relative to the quantity of material to be removed under the original and supplemental contracts *supersede the provisions in the original contract,"* etc. Provision was made by Act of Congress to modify the project, a contract as formal as the original one was entered into, the consent of the Bankers' Surety Company was obtained for the supplemental contract, and everything was done apparently except obtaining the consent of the United Surety Company or its receivers. The Bankers' Surety Company offered a new bond and supposed it would be accepted. Other things might be referred to, but we can have no doubt that the supplemental contract did impose additional and material burden on the surety company, if it is held liable.

Nor do we think that paragraph six of the contract, quoted above, can properly be construed to mean that a surety on a bond for the fulfillment of such a contract as that of the Midland Company of 1907 continued liable under such a supplemental contract as this. Its officers, of course, knew that the parties might make a contract to change or modify the original one, but it cannot be said that it could have been contemplated by the parties or the surety when it entered into the bond in 1907 that it would still be liable under a contract which did in effect *supersede* the one it undertook the performance of, unless it consented to it. If the parties could make a contract under paragraph six for additional dredging

amounting to one, two or three hundred thousand cubic yards and bind the surety on the original bond for its performance, why could they not do so for as many millions? This supplemental contract was made four years after the original, when the bond was given. A surety might be satisfied to go on the bond of a contractor for work to be done by him at a certain place, of a fixed quantity and within a definite space in 1907, but not for additional work outside of that place or space undertaken in 1911. A contractor might be so situated that the surety would believe he could perform the work undertaken by him in 1907, but would not be satisfied that he could do the additional work undertaken in 1911. If a surety is to be held bound under a new contract by reason of paragraph six for an increased amount of work at places outside of those defined by the original contract, simply because the parties made a supplemental contract, why could they not change or modify the original one, without the consent of the surety, by reducing the price per cubic yard? A new or supplemental contract providing for additional dredging at the same price, made four years after the original one, might well be equivalent to agreeing to a reduction of price, for the experience of late years has shown that while a contract at one price at one time would be regarded as a fair one, such a contract a few years later might be disastrous and impossible of performance without great loss, if not ruin.

While we fully realize that surety companies, which are supposed to be paid for the risks they assume, and practically fix their own prices, should not be permitted to escape liability on such purely technical grounds as sureties once could do, and that the time has come when the old rule of *strictissimi juris* must be very much modified, we cannot feel justified in holding a surety responsible for what we regard as a materially different contract from the one it undertook to be responsible for, unless it has more clearly made itself responsible for the new contract than can reasonably be claimed in this case. As the United Surety Company was in the hands of receivers when this supplemental contract was en-

tered into, it may not have been able to give its consent to the new contract, but the court could have authorized the receivers to consent to it, or it could have declined to permit them to do so, as it deemed best and proper, and in the latter event the government could have either required other security, as was in fact tendered it, or could have declined to give the Midland Company the new contract.

The case of *Wehr* v. *Ger. Evan. Luth. Con.*, 47 Md. 177, is one relied on by the appellant. JUDGE ALVEY repeated the well known general rule as to sureties, that "it is perfectly well settled that a surety has the right to stand upon the very terms of his contract; and if such contract be altered or varied in any material point without his consent, so as to constitute a new agreement varying substantially from the original, he is no longer bound"—citing, amongst other cases, *Miller* v. *Stewart*, 9 Wheat. 680, but the court found that the alterations, additions, etc., there relied on as a defense were within the limits prescribed by the contract which the surety had agreed to, and held he had no right to complain. In this case paragraph six of the contract provides that such a change or modification as is involved here must be made by such an agreement as is therein provided for. It was in effect a new agreement executed with all the formalities of the original one, and we are satisfied that the consent of the surety was contemplated in order to make it liable under the new contract.

In *Amer. Bonding Co.* v. *U. S.*, 167 Fed. 910, there was a contract for dredging work which required the contractor to deposit the dredged material in a specified place and provided that he could not be paid for any material elsewhere. The contract was annulled under a provision in it, and a new contract was entered into. The original contractor and his surety were sued. It was held that, as against the surety, the contract itself provided the only measure of liability, and that the surety was not liable when the contract subsequently let to another contractor requiring the dredged material to be dumped in a different place was neither agreed to between

the parties to the original contract nor assented to by the surety.

Paragraph six in that contract was the same as the one here. The contractor, Axman, did not dredge and remove the minimum cubic yards required, and he was notified that the contract was annulled and the same day notice was given to the surety and a contract entered into with the North American Dredging Company "to do the work left undone" by Axman. The court, after referring to paragraph six said: "No such agreement was ever entered into by the original contracting parties in writing or otherwise, and therefore no provision or agreement for a change or modification of the contract ever went into effect; but this provision of the contract supports the contention of the plaintiff in error, that in completing the contract and in doing the work Axman left undone, there could be no departure from the terms of the original contract without such an agreement, *and, further, that the surety could not be held liable unless it also agreed in writing to the change*" (italics ours). The court referred at some length to the case of *United States* v. *Freel,* 186 U. S. 309, which is one of the leading cases in matters of this kind and it was there held that the surety was not liable. The court in the *American Bonding Co. case,* in referring to the *Freel case,* said: "It will be observed further that the contractor was to be compensated for the additional expense in making the change, so that the surety was in no way injured by the change in the contract. The surety was, nevertheless, held discharged from liability. This case is a sufficient answer to the contention of the United States in the present case, that the change in the contract was not material to the plaintiff in error." The case of *Axman* v. *U. S.,* 167 Fed. 922, was submitted to the Circuit Court of Appeals upon the record and brief of the case of the American Bonding Co. and it was reversed. Those two cases were affirmed in *U. S.* v. *Axman,* 234 U. S. 36, where the case of *U. S.* v. *McMullen,* 222 U. S. 460, was considered and distinguished. See also *Tidewater Oil Co.* v. *Globe Indemnity Co.,* 238 Fed.

157, where Judge Hough referred to the *Freel case* and said of it: "Later decisions have not affected the authority of that decision. It was specifically approved in *Guaranty Co.* v. *Pressed Brick Co.,* 191 U. S. 416. In *United States* v. *McMullen,* 222 U. S. 460, Holmes, J., pointed out that sureties on a bond have no right to insist upon a "sacrosanct prohibition of change * * * The law has no objection to (change) if (sureties) assent. Whether they have done so or not is simply a question of construction and good sense, taking words and circumstances into account."

Without citing other authorities, it follows from what we have said that the decree overruling exceptions of the United States must be affirmed.

*Decree affirmed.*