AMERICAN BONDING CO. OF BALTIMORE v. UNITED STATES.†

(Circuit Court of Appeals, Ninth Circuit. February 1, 1909.)

No. 1,570.

UNITED STATES (§ 67*)—PRINCIPAL AND SURETY—EXTENT OF LIABILITY OF
SURETY—DREDGING CONTRACT—PROVISION FOR COMPLETION OF WORK BY
EMPLOYER.

A contract let by the United States for dredging work in a harbor required the contractor to deposit the dredged material in a specified place, and provided that he would not be paid for any material deposited elsewhere; that if any changes should be found necessary in the specifications they must be agreed to in writing; and gave the United States, in case the work should not be prosecuted faithfully and diligently, the right to annul the contract and recover from the contractor whatever sums might be expended "in completing the said contract in excess of the price herein stipulated to be paid  *  *  *  for completing the same." The contract was annulled under said provision, and the United States brought suit against the contractor and his surety to recover thereon. Held, that as against the surety the contract itself provided the only measure of liability, and that the surety was not liable where the contract subsequently let to another requiring the dredged material to be dumped in a different place was neither agreed to between the parties to the original contract nor assented to by the surety.

[Ed. Note.—For other cases, see United States, Dec. Dig. § 67.*]

In Error to the Circuit Court of the United States for the Northern District of California.

This was an action at law brought by the United States against Rudolf Axman on an agreement dated November 21, 1902, and entered into between Lieutenant-Colonel W. H. Heuer of the Corps of Engineers, for and on behalf of the United States, and Rudolf Axman, for the dredging of a channel through the shoal in San Pablo Bay in California. The action was also against the plaintiff in error on a bond of the same date guaranteeing the fulfillment of the contract. The guaranty bond is in the sum of $50,000. The action was brought to recover from Axman the full sum of $65,500.94, and from the plaintiff in error the sum of $50,000, for the alleged failure on the part of Axman to prosecute faithfully and diligently, or at all, the work in accordance with the specifications and requirements of said contract, and for his refusal to complete or perform the same. The case was tried before the court and jury, and a judgment entered in favor of the defendant in error, and against Axman and the plaintiff in error for the sum of $39,902.59 and costs. The case is here on writ of error sued out by the American Bonding Company.

Jesse W. Lilienthal, for plaintiff in error.

John R. Aitken (Chas. A. Shurtleff and Frank W. Aitken, of counsel), amicus curiæ.

Robt. T. Devlin, U. S. Atty., and George Clark, Asst. U. S. Atty.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. The dredging contract entered into between Colonel Heuer, of the Corps of Engineers, for and on behalf of the United States, and Rudolf Axman, on November 21, 1902, provided, among other things, in paragraph 1, that:

"The said Rudolf Axman will do such dredging in San Pablo Bay, California, as may be required by the said W. H. Heuer, in accordance with the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied February 23, 1909.

specifications hereunto annexed, and that he, the said W. H. Heuer, or his successor, will pay to the said Rudolf Axman the sum of eleven and forty-four one hundredths cents per cubic yard for all such dredging as shall be done in strict accordance with the said specifications hereunto annexed, and is ordered and accepted by the said W. H. Heuer, or his agent."

In paragraph 3 of the agreement it was provided: .

"The said party of the second part shall commence, prosecute, and complete the work herein contracted for as set forth in paragraphs 31 and 46 of the attached specifications."

In paragraph 4 of the agreement it was provided:

"If, in any event, the party of the second part (Axman) shall delay or fail to commence with the delivery of the material, or the performance of the work, on the day specified herein, or shall, in the judgment of the engineer in charge, fail to prosecute faithfully and diligently the work in accordance with the specifications and requirements of · this contract, then, in either case, the party of the first part, or his successor legally appointed, shall have power with the sanction of the Chief of Engineers to annul this contract by giving notice in writing to that effect to the party (or parties, or either of them) of the second part, and upon the giving of such notice all payments to the party or parties of the second part under this contract shall cease, and all money or reserved percentage due or to become due the said party or parties of the second part, by reason of this contract, shall be retained by the party of the first part until the final completion and acceptance of the work herein stipulated to be done; and the United States shall have the right to recover from the party of the second part whatever sums may be expended by the party of the first part in completing the said contract in excess of the price herein stipulated to be paid the party of the second part for completing the same."

It was provided in paragraph 6 of the agreement that:

"If, at any time during the prosecution of the work, it be found advantageous or necessary to make any change or modification in the project, and this change or modification should involve such change in the specifications as to character and quantity, whether of labor or material, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the Secretary of War; provided, that no payments shall be made unless such' supplemental or modified agreement was signed and approved before the obligation arising from such modification was incurred."

The specifications referred to in the agreement provided in paragraph 31 that:

"The contractor will be required to commence work under the contract within sixty days after the date of notification of approval of the contract by the Chief of Engineers, U. S. Army, to prosecute the said work with faithfulness and energy, and to complete it within twenty-eight (28) months, after the date of the commencement."

In paragraph 35 it was provided that:

"The shoal to be dredged is in San Pablo Bay, California, is about 5 miles in length, and has a least depth of 19 feet at low water. It extends from Pinole Point to Lone Tree Point, and is distant 1¼ to 1½ statute miles N. W. of the points referred to. The average depth of the excavation is about 9 feet."

In paragraph 36 it was provided:

"The work to be done is to excavate a channel through the shoal, to have a bottom width of 300 feet, a depth of 30 feet at mean low water, and a length of about 27,000 feet; to deposit the spoil as near the south shore as practicable, within lines drawn between Pinole Point and Lone Tree Point, at such places as may be designated by the engineer officer in charge; and to impound the material behind bulkheads or dykes of suitable construction, subject to approval by the engineer officer in charge, which must be built and maintained by and at the expense of the contractor during the life of the contract."

In paragraph 38 it was provided:

"Material dredged outside the designated lines of excavation, below the depths provided in paragraph 37, or deposited otherwise than as herein specified, directed and agreed upon, will not be paid for. The total amount to be dredged is estimated at 2,721,000 cubic yards, more or less."

In paragraph 39 it was provided:

"All dredged material is to be deposited within the limits of the area described in paragraph 36. The method of deposit will be subject to approval by the engineer officer in charge."

In paragraph 40 it was provided:

"The part of the area available for the deposit of material from scows has an average width of about ¾ of a mile. Its distance from the site of dredging varies from 1 to 2 miles. The location of the place of deposit, the depths of the water therein, and the location of the dredging, are shown on maps on file in this office."

In paragraph 46 it was provided:

"The work must progress at the rate of at least 100,000 cubic yards per month, and to entitle the contractor to the monthly payments provided for in paragraph 30 of these specifications, an average of not less than 100,000 cubic yards per month must have been dredged and deposited; the calculation of averages to be made from the day on which the contractor requires the work to be commenced."

In paragraph 48 it was provided:

"If at any time after the date set for beginning work it shall be found that the required minimum rate of progress is not being maintained, the engineer officer in charge shall have the power, after due notice in writing to the contractor, to employ such additional plant or purchase such materials as may be necessary to ensure the completion of the work within the time specified, charging the cost thereof against such sums as may be due or become due to the contractor. This provision, however, shall not be construed to affect the right of the United States to annul the contract as provided for in the form of contract to be entered into."

In paragraph 49 it was provided:

"Work must be pushed continuously, except on Sundays and legal holidays. Night work will be permitted, when proper provision must be made, in all cases by the contractor at his expense, for the comfort of the inspectors and other United States employees who may be on the work."

On January 3, 1903, Colonel Heuer notified Axman that his contract had been approved by the Chief of Engineers, U. S. Army, and that, in accordance with its terms, work must be commenced within 60 days from the date of the notification. This was March 3, 1903.

Axman actually began work on February 24, 1903, but he did not dredge and remove the minimum of 100,000 cubic yards as required by paragraph 46 of the specifications. On December 24, 1903, Colonel Heuer sent Axman the following notice:

"I hereby notify you that the contract entered into by you with me on November 21, 1902, for dredging in San Pablo Bay, California, is this day annulled, as provided for in paragraph 4 of the contract, on account of failure to comply with the requirements of the specifications."

On the same day a similar notice was sent to the plaintiff in error. On June 21, 1904, Colonel Heuer entered into a contract with the North American Dredging Company to—

"do such dredging in San Pablo Bay, California, as may be required by the said W. H. Heuer, in accordance with the specifications hereunto annexed and deposit the spoils in place of deposit (b) as described in paragraph numbered thirty-six in said specifications hereunto annexed; and that he the said W. H. Heuer, or his successor, will pay to the said North American Dredging Company the sum of fourteen and forty-eight one hundredths cents per cubic yard for all such dredging as shall be done in strict accordance with the specifications hereunto annexed."

Paragraph 36 (b) of the specifications referred to in the agreement with the North American Dredging Company provided as follows:

"To deposit the spoil in water exceeding 50 feet in depth, lying within the area bounded by lines drawn from The Sisters to Point San Pablo, thence to Marin Islands, and thence back to The Sisters. The top of any pile shall not be higher than 40 feet below the level of low tide."

Paragraph 39 provides as follows:

"Material dredged outside the designated lines of excavation, below the depths provided in paragraph 38, or deposited otherwise than as herein specified, directed and agreed upon, will not be paid for. The total amount to be dredged is estimated at 2,285,000 cubic yards, more or less."

Paragraph 40 provides as follows:

"All dredged material is to be deposited within the limits of the area described in paragraph 36. The method of deposit will be subject to approval by the engineer officer in charge."

Paragraph 41 provides as follows:

" * * * In place of deposit (b) the deep part of the area available for the deposit of material from scows is triangular in shape, covering an area of about one square mile. Its distance from the nearest point of the dredging is about 5 statute miles. The location of the places of deposit, the depths of water therein, and the location of the dredging, are shown on maps on file in this office."

Paragraph 42 provides as follows:

"Any deposit outside of authorized dumping grounds will render the contract liable to be annulled."

The complaint set forth the provisions of the dredging contract entered into by Colonel Heuer with Axman and the guaranteeing of the contract by the plaintiff in error.

It is alleged that Axman failed to prosecute faithfully or diligently, or at all, the work in accordance with the specifications and requirements of said contract, and did refuse to complete and perform the

same, or any part thereof, and did abandon said contract and refuse to do the work in said contract provided, or any part thereof; that, by reason of Axman's violation of the provisions of the contract, Colonel Heuer annulled the same; that after the annulment the work was readvertised, and a contract was made with the North American Dredging Company "to do the work left undone" by Axman; that the North American Dredging Company carried out the work and completed the contract at the cost of $311,991.29, while the cost of the same work at the price for which Axman contracted to do it would have amounted to $246,490.35, or a difference of $65,500.94; that by reason of Axman's failure to carry out his contract the United States was compelled to pay and did pay the sum of $65,500.94 more than it would have cost had Axman carried out his contract according to its terms and conditions. Judgment was asked against Axman in the sum of $65,500.94, and against the American Bonding Company in the sum of $50,000. The plaintiff in error interposed a demurrer to this complaint on the grounds, among others, that the complaint did not state facts sufficient to constitute a cause of action, and that the complaint was uncertain in the following particulars; among others, that it did not appear therefrom: (1) Whether any of the sums alleged to have been paid said North American Dredging Company were expended by said Heuer in the completion of said contract of November 21, 1902, between Axman and Heuer. (2) Whether the work alleged in the complaint to have been done by the North American Dredging Company was done under the same specifications attached to said Axman contract and in said complaint referred to.

The demurrer was overruled, and thereupon the plaintiff in error filed its separate answer, in which it denied generally the allegations of the complaint, and specifically denied that Axman abandoned his contract, and denied that a contract was made with the North American Dredging Company "to do the work left undone" by Axman as provided in his contract, and by way of a further answer and defense it was alleged that:

"Said North American Dredging Company did not deposit, nor did any other person or corporation deposit any part of said material or 'spoil' as near the south shore as practicable within lines drawn between said Pinole Point and Lone Tree Point at the place designated by the engineer officer in charge, or impound the said material between bulkheads or dykes of suitable construction, or otherwise, as provided for and required by the contract made between the said W. H. Heuer and Axman."

For a further answer and defense, it was alleged that Colonel Heuer was openly hostile and unfriendly to Axman, and specific acts are alleged which it is charged had for their purpose the impeding and delaying of the work with the intent to prevent Axman from carrying out his contract and performing the work as required in the specifications. The substance of these charges is that Colonel Heuer acted arbitrarily and without just cause in the conditions and requirements imposed upon Axman during the progress of the work and in finally annulling the contract.

The case was tried before the court and a jury, and among other instructions given to the jury was an instruction to the effect that Ax-

man had excavated 196,000 cubic yards for which he should be allowed a credit of $22,422.40. The verdict was for the United States for the sum of $39,902.59.

No evidence was introduced tending to show that Axman abandoned his contract, or that he refused to do the work in said contract provided. The defense that Colonel Heuer acted arbitrarily and without just cause in imposing conditions and requirements upon Axman in executing the work, and in finally annulling the contract, involved questions of fact which we think were submitted to the jury with proper instructions. A number of assignments of error relate to the action of the court in admitting evidence concerning the contract with the North American Dredging Company, and the instructions of the court with respect thereto. They all present the single question whether, in the contract entered into by Colonel Heuer with the North American Dredging Company "to do the work left undone" by Axman, there was a material departure from the contract.

This is not a suit to recover generally whatever damages the United States would have sustained had Axman abandoned his contract, but a suit for damages under the express stipulations of the contract, which are set forth in the complaint and made the basis of the action. These stipulations are:

"If * * * the party of the second part * * * shall in the judgment of the engineer in charge fail to prosecute faithfully the work in accordance with the specifications and requirements of this contract * * * the party of the first part * * * shall have power to annul this contract * * * and the United States shall have the right to recover from the party of the second part whatever sums may be expended by the party of the first part in completing the said contract in excess of the price herein stipulated to be paid the party of the second part for completing the same * * * and the party of the first part shall be authorized to proceed to secure the performance of the work or delivery of the materials."

The allegations of the complaint are that Axman had failed to prosecute the work faithfully and diligently, and that Colonel Heuer thereupon annulled the contract, and entered into a contract with the North American Dredging Company "to do the work left undone" by Axman, and that the North American Dredging Company carried out the work and completed the contract.

In the Axman contract it was provided that:

"The work to be done is to excavate a channel through the shoal, to have a bottom width of 300 feet, a depth of 30 feet at mean low water, and a length of about 27,000 feet; to deposit the spoil as near the south shore as practicable, within lines drawn between Pincle Point and Lone Tree Point, at such places as may be designated by the engineer officer in charge; and to impound the material behind bulkheads or dykes of suitable construction, subject to approval by the engineer officer in charge, which must be built and maintained by and at the expense of the contractor during the life of the contract."

In the contract with the North American Dredging Company it was provided that:

"The work to be done is to excavate a channel through the shoal, to have a bottom width of 300 feet, a depth of 30 feet at mean low water, and a length of about 27,000 feet; to deposit the spoil in water exceeding 50 feet in depth, lying within the area bounded by lines drawn from The Sisters to

Point San Pablo, thence to Marin Islands, and thence back to The Sisters. The top of any pile shall not be higher than 40 feet below the level of low tide."

In the Axman contract the place for the deposit of the material was designated as follows:

"The part of the area available for the deposit of material from scows has an average width of about ¾ of a mile. Its distance from the site of dredging varies from 1 to 2 miles. The location of the place of deposit, the depths of water therein, and the location of the dredging, are shown on maps on file in this office."

In the contract with the North American Dredging Company the place for the deposit of the material is designated as follows:

"In place of deposit (b) the deep part of the area for the deposit of material from scows is triangular in shape, covering an area of about one square mile. Its distance from the nearest point of the dredging is about 5 statute miles. The location of the places of deposit, the depths of water therein, and the location of the dredging, are shown on file in this office."

Evidence was admitted, over the objection of the plaintiff in error, tending to show that it would cost less to deposit the dredged material at the place designated in the contract with the North American Dredging Company than it would cost to deposit it at the place designated in the Axman contract. It was thereupon contended on the part of the United States that the departure from the Axman contract was immaterial, but it was provided otherwise in the specifications accompanying the Axman contract. It is provided in paragraph 38 that:

"Material * * * deposited otherwise than as herein specified, directed and agreed upon will not be paid for."

Colonel Heuer in his testimony said Mr. Axman was not allowed to deposit material elsewhere than behind the bulkheads. Axman testified that after the place designated for him to deposit the dredged material behind the bulkheads had filled up so that he could only get in at high tide he applied to Colonel Heuer to allow him to deposit the dredged material anywhere else than behind the bulkheads. He also asked permission to be allowed to dump either on the north side of the channel or down at "The Sisters" (the latter place being the place subsequently designated in the contract with the North American Dredging Company for the deposit of the dredged material), but Colonel Heuer refused to allow Axman to deposit the material anywhere else than that specified in the contract. He said to the witness:

"I will not allow you to dump any place else, and if you do I will not pay you a cent for anything."

Colonel Heuer also testified:

"I think the contract specified that he was not to distribute any material above low-water mark. I am not certain about that, but it was my intention anyway that he should not."

Axman testified that Colonel Heuer would not permit him to bring the dumped material up too high. He only wanted it up to the low-water mark. Colonel Heuer testified in explanation of this requirement:

"I prevented the depositing of the spoil above the low-water mark for the following reasons: The tidal area of San Francisco Bay covers about 480 square miles. The volume of tide between high water and low water, or tidal prism, is what maintains the depth of water in our bar of San Francisco; therefore, the government does not let anybody put anything above low-water mark."

It thus appears from the contract and from this testimony that the depositing of the dredged material at the place designated in the contract was, under the express terms of the contract and the requirements of Colonel Heuer, the engineer in charge, an independent and material feature of the contract, so material, indeed, that a failure to comply with its terms would deprive the contractor of all compensation for his work. But it is contended on behalf of the United States that, as the contract itself provided that a change might be made in the project, during the prosecution of the work, with the consent of the contractor, the same thing might be done by the government, after the annulment of the original contract, without the consent of the original contractor. But the contract also provided that:

"Such change or modification must be agreed upon in writing by the contracting parties. The agreement setting forth fully the reason for such change and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the Secretary of War; provided, that no payments shall be made unless such supplemental or modified agreement was signed and approved before the obligation arising from such modification was incurred."

No such agreement was ever entered into by the original contracting parties in writing or otherwise, and therefore no provision or agreement for a change or modification of the contract ever went into effect; but this provision of the contract supports the contention of the plaintiff in error that, in completing the contract and in doing the work Axman left undone, there could be no departure from the terms of the original contract without such an agreement, and, further, that the surety could not be held liable unless it also agreed in writing to the change.

It is contended on behalf of the United States that the plaintiff in error was not injured by the change in the project made in the contract with the North American Dredging Company, and that it is therefore no ground for complaint. But the plaintiff in error objects that it did not guarantee the contract with the North American Dredging Company under any conditions; that its guaranty was that Axman would perform the conditions of his contract, and in case of failure its liability extended to the completion of the Axman contract and in doing the work he left undone; but it did not agree to become liable for any other contract, or for doing any work other than that left undone by Axman under his contract. A contract similar to the one under consideration was the subject of controversy in the case of American Surety Co. v. Woods, 105 Fed. 741, 45 C. C. A. 282. In that case the contractors abandoned the contract, and the work was never completed. The action was to recover of the contractors the difference between the amount the employer would have paid the contractors under the contract for the completion of the work and the

amount it would cost the employer to complete the work left undone by the contractors. The Circuit Court of Appeals for the Fifth Circuit stated the question for determination, as follows:

"The question to be considered is the charge of the court on the measure of damages. The instruction, in effect, was that the measure of damages was the difference between the contract price and what it would have cost to finish the sewers, and that to recover this difference it was not necessary for the sewerage company to complete the work."

Referring to a provision of the contract providing that, in the event the contractor was delayed or failed to do the work, the employer could take charge of the work and finish it, the court said:

"The company is authorized to charge the expense of labor to the contractors. Such cost is to be paid out of the money due to the contractors or to become due by the contract. If the expense of doing the work was less than the sum that would be due and payable under the contract, the contractors were to receive the difference; and, if the expense was greater, the contractors should pay the amount of such excess. It is clear, therefore, that the parties to the work anticipated that the contractors might not finish the work, and provided for the measure of damages on the completion of the work by the sewerage company at a cost greater than the contract price. * * * This provision of the contract cannot be ignored in deciding this question. The provision seems to have been made for the benefit of both parties. It gave to the sewerage company the right and power to take charge of the sewers and finish them on account of the delay or failure of the contractors. On the other hand, it secured to the contractors any sum that might be left of the unpaid contract price after the sewerage company had paid for the completed work. It also fixed and limited their liability for damages on account of their failure to finish the work, so far as this item of damages is concerned, to such excess as the sewerage company would have to pay over the contract price. This clause of the contract, conceding a different rule to prevail in its absence, rescued the case from the uncertain and speculative control of expert witnesses, and applied it to the practical test of actual cost. This secured to the contractors and their surety a valuable right. They should not be deprived of it. From the contract in this case, having due regard to section 19 of it, we do not think it can 'be reasonably supposed' that the parties contemplated that for a failure by the contractors to finish the work they were to be held liable for any outlay which might be required to complete it, before the sewerage company was at any expense on that account."

It was accordingly held that the surety was not liable under the contract. So, in this case, the suit is upon the contract, which provides the conditions of its fulfillment, and the measure of damages for its nonfulfillment, and if, under its terms, the United States has not completed its contract with Axman and has not completed the work he left undone in a substantial particular, no liabilities have been established against the surety. In American Bonding & Trust Co. v. Gibson County, 127 Fed. 671, 62 C. C. A. 397, the Circuit Court of Appeals for the Sixth Circuit had before it a contract for the completing of a courthouse. The contract provided that if the contractor failed in any respect to prosecute the work with promptness and diligence, or failed in the performance of any of the agreements contained in the contract, such failure being certified by the architects, and if the architects further certified that the failure was sufficient ground for the action, the county might terminate the contract and enter upon the premises and take possession for the purpose of completing the work. It was further provided that, if the contract was terminated and com-

pleted by the county, the excess paid by the county to other contract-ors over the contract price should be paid by the contractors and his surety, and that such expense for finishing the work and any damage incurred through such default shall be audited and certified by the architects, whose certificate thereof shall be conclusive upon the parties. The architects notified the building committee of the county that the contractors had failed to prosecute the work with promptness and diligence, and certified that the failure, refusal, and neglect was such as to warrant the termination of the contract. Accordingly, after notice, the employment of the contractors was terminated, possession taken, and the building completed by the county. The contractors did all of the work except that covered by the final payment. The action was brought to recover the expense incurred by the county over the contract price in completing the courthouse, but it was not alleged or proved that the architects had audited and certified the expense for the damage incurred by the county in completing the contract. Notwithstanding the lack of this certificate, the lower court directed a verdict against both the contractors and their surety, the bonding company. In this action the Circuit Court of Appeals held that the lower court was in error, saying:

"In instituting this suit, the county planted itself upon the contract, and the bond given for its faithful performance. It alleged that, in terminating the employment of the contractors, it had faithfully observed all the conditions of the contract, and it sought to recover, not only the cost of completing the building, but the per diem damages for delay provided in case of default. The distinction sought to be drawn by the plaintiff, that the suit is not one on the contract, but one for damages on account of the abandonment of the contract, does not appeal to us. This is not a case like Fuller Company v. Doyle (C. C.) 87 Fed. 687. where the contractor, without doing any sub-stantial work, abandoned his contract, but a case where the contractor, having done all the work except that covered by the last payment, had his employment terminated under article 5, through a strict compliance with its provisions. The damages sought to be recovered here are not damages outside the contract, but damages under the contract, resulting from a violation of its provisions. Accordingly, the surety is also sued. Now, the surety guaranteed the faithful performance of the contract, and the measure of the damages for which it can be held responsible must be found in the contract itself. If there be in the contract a provision for ascertaining the amount of damages incurred through a violation of any of its provisions, the surety has a right to insist on its observance before being held responsible. Under the contract, the contractors agreed to construct a building according to certain specifications. The surety guaranteed the faithful performance of the contract. Architects were selected to supervise the work, and the contractors had to present their certificates before receiving any pay. In case the contractors failed to finish the work, the owner might take over the job by complying with certain provisions. But if he did not, he was obliged to complete the work in accordance with the specifications, and, before he could collect what it cost beyond the contract price, he had to have the certificate of the architects showing the expense and damage incurred. In the case of International Cement Co. v. Beifeld, 173 Ill. 179, 50 N. E. 716, where a building contract contained a clause identical in terms with that before us, the court held that the certificate of the architect was a condition precedent to the recovery from the contractor of the additional expense incurred in finishing the work. It was urged that the contractor abandoned the contract, but the court overruled the contention, holding that the case was tried upon the theory that the owner was entitled to such damages as were provided for by the contract, not damages outside of the contract."

· The recent case of United States v. Freel, 186 U. S. 309, 22 Sup. Ct. 875, 46 L. Ed. 1177, is more in point, and is authority upon all the questions involved in this case. The action was against the principal and sureties on a contractor's bond, given to secure the performance of contract to construct a dry dock at the Brooklyn Navy Yard. The contract was between the contractor and the Chief of the Bureau of Yards and Docks in the Navy Department. It provided for the construction of a dry dock—

"to be located at such place on the water line of the navy yard, Brooklyn, N. Y., as shall be designated by the party of the second part."

The seventh paragraph of the contract provided (substantially as in the contract before the court) that:

"If at any time it shall be found advantageous or necessary to make any change, alteration or modification in the aforesaid plans and specifications, such change, alternation or modification must be agreed upon in writing by the parties to the contract."

It was further provided:

"That if any enlargement or increase of dimensions shall be ordered by the Secretary of the Navy during the construction of the dry dock, that the actual cost thereof shall be ascertained, established and determined by a board of naval officers to be appointed by the Secretary of the Navy, who shall revise said estimate and determine the sum or sums to be paid the contractor for the additional work that may be required under this contract."

It was further provided:

. "That no change herein provided for shall in any manner affect the validity of this contract."

A supplemental contract in writing was entered into between the contractor and the Chief of Yards and Docks, providing that the location of the dry dock should be—

"one sixty-four (164) feet further inland than laid down and staked out when the said contract was entered into."

This supplemental contract provided full compensation to the contractor for the additional work, and it recited that it was under the provisions of and in accordance with article 7 of the original contract, but the surety was not a party to the supplemental contract. The contractor proceeded with the work under the original and supplemental contract, but so slowly, negligently, and unsatisfactorily that the Secretary of the Navy, under the option and right reserved to him by the said contract, declared the contract forfeited on the part of the contractor, and thereafter, under the provisions of the contract, the Secretary of the Navy proceeded to complete the dry dock and appurtenances in accordance with the contracts, plans, and specifications, at a cost to the United States of the sum of $370,000. The sum of $72,414.16 represented the damage sustained by the plaintiff in completing the contract. The suit was brought to recover from the contractor and his sureties the damages alleged. The sureties interposed a demurrer, on the ground that the plaintiff did not state facts sufficient to constitute a cause of action, and the question was whether a surety on a contractor's bond conditioned for the performance of a

contract to construct a dry dock was released by subsequent changes in the work made by the principals without the consent of the surety. It was claimed on behalf of the United States that the change made in the original contract by the supplemental agreement was within the contemplation of that contract, and must be deemed to have been assented to in advance by the surety. The trial court held that this change was not within the scope of the original contract, but was such a change that exonerated the surety from liability for the subsequent dereliction of his principal. This view of the contract was affirmed by the Supreme Court, which, after citing authorities relating to the liabilities of sureties, said:

"The proposition that the obligation of a surety does not extend beyond the terms of his undertaking, and that when this undertaking is to assure the performance of an existing contract, if any change is made in the requirements of such contract in matters of substance without his consent, his liability is extinguished, is so elementary that we need not cite the numerous cases in England and in the state and federal courts establishing it. Many of these cases will be found cited in the opinion of Thomas, J., in this case. United States v. Freel (C. C.) 92 Fed. 299."

It will be observed that, unlike the case before this court, the change in the original contract was made in accordance with the terms of the contract and the change agreed to by the parties to the contract in writing, but, like the present case, the consent of the surety to the change was not obtained, and it was upon that fact that the surety was held not liable. It will be observed further that the contractor was to be compensated for the additional expense in making the change, so that the surety was in no way injured by the change in the contract. The surety was, nevertheless, held discharged from liability. This case is a sufficient answer to the contention of the United States in the present case, that the change in the contract was not material to the plaintiff in error. It is not necessary to review the cases bearing upon this last question. They are numerous, and the law has been authoritatively determined. The surety has the right to stand upon the very terms of his contract. If the conditions of the liability have not accrued under the terms of the contract, the surety is not liable, and if a change is made in the contract without his consent his liability is at an end, even though it may appear that the change is for his benefit. The law as declared by the Supreme Court in Miller v. Stewart, 9 Wheat. 680, 701, 6 L. Ed. 189, is clear and distinct upon this question. It says:

"Nothing can be clearer, both upon principle and authority, than the doctrine, that the liability of a surety is not to be extended, by implication, beyond the terms of his contract. To the extent, and in the manner, and under the circumstances pointed out in his obligation, he is bound, and no further. It is not sufficient that he may sustain no injury by a change in the contract or that it may even be for his benefit. He has a right to stand upon the very terms of his contract, and, if he does not assent to any variation of it, and a variation is made, it is fatal."

In Reese v. United States, 9 Wall. 13, 21, 19 L. Ed. 541, the same court said:

"Any change in the contract on which they are sureties, made by the principal parties to it without their assent, discharges them, and for obvious

reasons. When the change is made they are not bound by the contract in its altered form, for to that they have never assented. Nor does it matter how trivial the change, or even that it may be of advantage to the sureties. They have a right to stand upon the very terms of their undertaking."

In the present case there was a substantial change in the work required to be done under the original contract. The North American Dredging Company did not under its contract complete the Axman contract, and did not do the work he left undone. The surety did not consent to this change, and is, therefore, not liable for the additional cost arising out of the contract for work done in lieu of that provided for in the Axman contract.

The judgment of the Circuit Court is reversed, and the case remanded for a new trial.