UNITED STATES v. WEISBERGER et al.

(Circuit Court of Appeals, Ninth Circuit. August 4, 1913.)

No. 2,244.

UNITED STATES (§ 67*)—CONTRACTS—BREACH—ACTION ON BOND.

Where a contract for government work in connection with an irrigation project provided that the Secretary of the Interior might suspend the contract, take over the work, and complete the same at the cost of the contractor, and it appeared that the work contracted for was a novel undertaking, neither the government nor the contractor knowing a great deal concerning its feasibility, and the Secretary of the Interior under such provision terminated the contract, and undertook to do the work itself, because it appeared that the work done in accordance with the specifications would not fulfill the desired results, and the government finished the same at an excess cost by performing it in a substantially different manner from that specified. it was not entitled to recover the excess from the contractor and his surety.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. § 67.*]

In Error to the District Court of the United States for the Southern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Action by the United States of America against Theodore Weisberger and others. Judgment for defendants, and the United States brings error. Affirmed.

The government brought this suit in the court below upon a contract entered into between it and the defendant Weisberger, and upon a bond given by the defendants for the faithful performance by the contractor of the provisions of his contract. The contract related to the construction of certain portions of the Tieton main canal of the Yakima-Tieton reclamation project of the United States Reclamation Service in the state of Washington. The portions of the work undertaken to be constructed by Weisberger were designated in the contract as "Schedule 6—A" and "Schedule 7—A," the first of which covered the manufacturing of concrete shapes for the canal and tunnel linings and for flumes, and the second covered the placing of the shapes in excavated canals and joining them together, so as to form a continuous solid concrete canal. By the original contract the entire work of the contractor was to be completed by March 31, 1908—the completion of that specified in Schedule 6—A being later extended to August 1, 1908, and that embraced by Schedule 7—A to October 15, 1908. The specifications contained these provisions, among others:

"8. Engineer.—The word 'engineer,' used in these specifications or in the contract, unless qualified by the context, means the Chief Engineer of the Reclamation Service. He will be represented on the work by assistants and inspectors, with authority to act for him and direct the work. Upon all questions concerning the execution of the work, the classification of the material in accordance with the specifications, and the determination of costs, the decision of the Chief Engineer shall be binding on both parties."

"11. Local Conditions.—Bidders must satisfy themselves as to all local conditions affecting the work, and no information derived from the maps, plans, specifications, profiles, or drawings, or from the engineer or his assistants, will in any way relieve the contractor from any risk or from fulfilling all the terms of his contract. The accuracy of the interpretation of the facts disclosed by borings or other preliminary investigations is not guaranteed. Unless the bidder or his representative has visited the site of the

work and made himself familiar with the conditions his bid on work depending on local conditions will not be considered."

"22. Suspension of Contract.—Should the contractor fail to begin the work within the time required, or fail to begin the delivery of material as provided in the contract, or fail to prosecute the work or delivery in such manner as to insure a full compliance with the contract within the time limit, or if at any time the contractor is not properly carrying out the provisions of his·contract in their true intent and meaning, notice thereof in writing will be served upon him; and should he neglect or refuse to provide means for a satisfactory compliance with the contract within the time specified in such notice, the Secretary of the Interior in any such case shall have the power to suspend the operation of the contract. Upon such suspension the Secretary of the Interior may take possession of all machinery, tools, appliances, and animals employed on any of the works to be constructed under the contract, and may appropriate all materials and supplies of any kind, shipped or delivered by or on account of the contractor for use in connection with the work, and he may use the same for the completion of the work, either directly by the United States or by other parties for it; or the Secretary of the Interior may employ other parties to carry the contract to completion, substitute other machinery or materials, purchase the material contracted for in such manner as he may deem proper, or hire such force and buy such machinery, tools, appliances, materials, supplies, and animals at the contractor's expense as may be necessary for the proper conduct of the work and for the completion thereof. Any excess of cost arising therefrom over and above the contract price will be charged against the contractor and his sureties, who shall be liable therefor. In the determination of the question whether there has been such noncompliance with the contract as to warrant the suspension thereof, the decision of the Secretary of the Interior shall be binding on both parties."

"25. Changes in Quantities.—The Secretary of the Interior reserves the right to make such changes in the quantities of work or material as may be deemed advisable, without notice to the surety or sureties on the bond given to secure compliance with the contract, by adding thereto or deducting therefrom, at the unit prices of the contract. These changes will include modifications of shapes and dimensions of canals, dams, and structures of whatsoever nature, particularly foundation work, to suit conditions disclosed as the work progresses. Should any change be made in a particular piece of work after it has been commenced, so that the contractor is put to extra expense, the engineer will make reasonable allowance therefor, which action shall be binding on both parties. Extra work or material will be paid for as hereinafter provided."

"27. Changes at Contractor's Request.—Should the contractor, by reason of conditions developing during the progress of the work, find it impracticable to comply strictly with the specifications, and apply in writing for a modification of structural requirements or methods of work, such change may be authorized by the engineer, provided it be not detrimental to the work and be without additional cost to the United States."

The canal as projected was about 11 miles in length. The government advertised for bids for the construction of the various divisions into which the engineers had divided the work by schedules, but no bids were received for any portion except that of Weisberger for that portion covered by Schedules 6—A and 7—A. The contract provided, among other things, that before it should be necessary for the contractor to begin construction under the contract the United States would build a wagon road in the Tieton Cañon to the dam planned for the diversion of the water from the river, and that the concrete shapes should be manufactured by Weisberger at various points in the bottom lands of the cañon at places theretofore selected by the government engineers for the purpose. There was evidence given tending to show that before the contract with Weisberger was actually signed he had been notified by the government engineer that the contract would· be awarded to him, upon receiving which notice he at once commenced assembling the necessary material and preparing the necessary plant for the manufacture of the shapes. No other bid than Weisberger's having been made, the govern-

ment undertook to do the balance of the work itself, and commenced the work of constructing the open canal at the diverting dam at the head of the first division of the projected work, near which Weisberger naturally, if not necessarily, commenced the manufacture of the shapes, which were made of sand and gravel, reinforced with steel rods running around and lengthwise of the shapes. There was evidence given tending to show that the road which the government agreed to construct was never completed to the diverting dam, nor within a mile and a half of it, and was not completed so that Weisberger could use it for the transportation of his machinery and appliances up to the point where the first shapes were manufactured until about July 1, 1907, and that after that the road was more or less blocked by government employés with débris thrown from the canal as it was being dug, and that subsequently a flood in the cañon destroyed the sites that had been designated for the manufacture of the shapes, all of which impeded and delayed the contractor in carrying on the work agreed to be performed by him.

The record also shows that the shapes for the open canal were to be a little more than a half circle 8 feet 3⅝ inches in diameter, with walls 4 inches thick, and with a cross-bar across the top to strengthen them, and for the tunnel lining the shapes were to be circular rings 6 feet 1¼ inches in diameter. They were to be laid in the canal so as to practically fit together, and to be joined with a joint one-eighth of an inch in width, the joints to be finished to a smooth flush surface. They were to be constructed and laid according to the specifications and requirements of the contract and in a manner satisfactory to the engineer in charge of the work. That engineer first required the shapes to be made with a variation of only one-sixteenth of an inch in the radius, but afterwards increased it to one-eighth of an inch. It appears that the method of lining provided for was entirely new, and that the place where the work was done, and necessarily had to be done, was remote from any railroad, and that it was therefore an expensive undertaking.

By the time the government had any portion of the canal ready for lining, the contractor had manufactured more than 3,000 of the shapes; and when he began to place them in the canal it was found practically impossible to construct and lay and join them as required by the specifications of the contract, resulting in an application by him, in the fall of 1907, for a change in the manner of constructing and joining the shapes, which application remained under consideration by the officers of the government for a considerable period, and during which period the contractor expended large sums in preparing for the future work. Meanwhile the engineers in charge of the work recommended that the government suspend the work in pursuance of the provisions of the contract and itself take over the work, together with the machinery, supplies, tools, and appliances which the contractor had provided, which recommendation was approved by the Secretary of the Interior on the 1st of February, 1908. Accordingly, the government took possession of the entire work so contracted for, together with the contractor's equipment, and completed it October 15, 1909.

The record shows that when the government undertook the work it found, as had the contractor, that it was impossible to make the shapes with a variation of only one-sixteenth or one-eighth of an inch in the radius, and a much larger variation was thereafter made, as well as a material change in the cross-bars and various other substantial changes. When the government finished the work it thus undertook to do, its engineer found that it had cost it $51,095.05 in excess of the price agreed to be paid Weisberger for the work he undertook to do, whereupon the present action was commenced to recover such excess from the contractor and his surety.

The contractor, in addition to his denials of the allegations of the complaint, set up three counterclaims and six affirmative defenses. The counterclaims were dismissed by the court below, and the affirmative defenses were put in issue by the government's reply. The surety company set up in defense that the contract as originally entered into was not possible of performance, and that the action of the Secretary of the Interior in suspending the contract was in effect fraudulent. The second affirmative defense pleaded by the contractor included the failure on the part of the government to perform the contract on its part, its wrongful stopping of the work, the taking

of the contractor's equipment, and the action of the Secretary of the Interior in suspending the contract, which was alleged to have been taken under such a gross misapprehension regarding the facts as amounted to a failure to exercise an honest and unbiased judgment in the premises. The third affirmative defense alleged that there was a mutual mistake of the parties in the making of the contract, and that it was impossible and impracticable for the contractor to perform it in accordance with its terms and conditions.

The case was tried with a jury, and resulted in a verdict in favor of the defendants. Subsequently the government moved the court for judgment notwithstanding the verdict, which motion was denied, and, judgment having been entered for the defendants, the case was brought here by writ of error.

Oscar Cain, U. S. Atty., and E. C. Macdonald, Asst. U. S. Atty., both of Spokane, Wash., and Ralph B. Williamson, Sp. Asst. U. S. Atty., of North Yakima, Wash., for the United States.

Parker & Richards, McAulay & Meigs, and Fred Fontaine, all of North Yakima, Wash., and John P. Hartman, of Seattle, Wash., for defendants in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). Only three of the five assignments of error can be considered by us, to wit:

"(2) That the court erred in denying plaintiff's motion for judgment at the close of all the testimony in the case.

"(3) That the verdict herein is contrary to the evidence and against the law.

"(4) That the court erred in entering judgment herein in favor of the defendants, and erred in entering judgment upon the verdict."

At the time the motion was made for judgment in favor of the plaintiff, the evidence before the court and jury tended to show that the government had suspended the contract, taken possession of the contractor's material and equipment, and, departing from the provisions of the contract in a number of material particulars, had finished that portion of the work covered by the contract at a claimed excess of $51,095.05 in cost, for which it sued the contractor and his surety. It is true that the Secretary of the Interior was by the express terms of the contract authorized, upon the happening of the conditions therein specified, to suspend the operation of the contract, take possession of the contractor's material and equipment, and use the same for the completion of the work contracted for, either directly by the government or by other parties for it, and recover any excess of cost arising therefrom over and above the contract price from the contractor and his surety. The work so authorized to be taken over and completed, either by the government itself or by other parties employed by it, was manifestly the work specified in the contract, and not any substantially different work. This is shown, not only by general principles applicable to such matters, but also in this instance by specific provisions of the contract itself, notably by the provision of the contract just referred to, and also by subdivisions 25 and 27 thereof, by the first of which the Secretary of the Interior is given the right to make certain changes and modifications at any time while the contract is being performed by the contractor, and by the second of which the contractor is given the right to make application to the govern-

ment for a modification of the structural requirements or methods of work, should he, by reason of conditions developing during the progress of the work, find it impracticable to comply strictly with the specifications of the contract.

The law is, we think, well settled that where the government undertakes to take over work contracted to be done for it, for some breach of the provisions of the contract, and itself perform the work, or employ a third party to do so at the expense of the former contractor and his surety, the work so to be completed, in order to hold the contractor or his surety for the excess of cost, must be in substance the work that was contracted for, and must be performed without substantial departure from the contract.   United States v. Freel, 186 U. S. 309, 22 Sup. Ct. 875, 46 L. Ed. 1177; American Bonding Co. v. United States, 167 Fed. 910, 93 C. C. A. 310; American Bonding Co. v. Gibson, 127 Fed. 671, 62 C. C. A. 397; United States Fidelity & G. Co. v. United States, 194 Fed. 611, 116 C. C. A. 187; Mundy v. United States, 35 Ct. Cl. 265.

If the power conferred upon the Secretary of the Interior to suspend the contract, take over the work contracted for, and complete it at the cost of the contractor, could be properly held to authorize a substantial departure from the provisions of the contract in completing it, and the recovery from the contractor of the excess of the costs of such completion, it might very well work the ruin of the contractor.   To hold him or his surety liable for the excess of cost of substantially different work would clearly be to hold them liable for something for which they did not bind themselves and the cost of which they might have no means of determining.   Besides, the third affirmative defense set up by the contractor alleged, as has been seen, that there was a mutual mistake of the parties in the making of the contract, and that it was impossible and impracticable for the contractor to perform it in accordance with its terms and conditions.   Much of the testimony of several of the government's own officers, having charge and supervision of the work, strongly tends to sustain that conclusion; and one of the defendant's witnesses—Herbert J. King—expressly testified that it was practically impossible to perform the work in accordance with the contract.   The whole case shows that it was a novel undertaking, neither the government nor the contractor knowing much of its feasibility; for otherwise, as said by the court below in one of its opinions, the contract was "such that no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other"—citing Hume v. United States, 132 U. S. 406, 10 Sup. Ct. 134, 33 L. Ed. 393.

We are of the opinion that the disposition of the case made in the court below was right, and its judgment is accordingly affirmed.