## No. 8434.

### McPHEE ET AL. v. THE UNITED STATES.

1. PLEADING—*Technical Defects.* An allegation in a petition of intervention that principal and sureties executed bonds to United States aggregating $155,000, each surety obligating himself to the extent and in the amount set opposite his name did not affect the substantial rights of the sureties, where the petition set out a copy of the bond which showed on its face that the total obligation was $150,000.

2. BOND—*Alteration.* Where the contractor was to furnish bond for $150,000, and with the different sureties executed separate bonds, each reciting that the instrument was a part of the security in the bond of $150,000 required of the contractor, each instrument showing the limit of individual obligations of the sureties on such bond, the fact that the aggregate of such limits was $155,000 did not constitute a material alteration of the bond for the obligation of the sureties rests upon the primary obligation of the principal.

3. CONTRACT—*Abandonment.* Under contract providing that upon contractor's neglect or refusal to provide means for energetic and satisfactory compliance with the contract within the time specified in a notice, the United States could suspend the contract and take charge of and complete the work, a written waiver by the contractor of the time given in such notice served upon him, followed by his leaving the work, was a voluntary abandonment of the contract.

4. ABANDONMENT OF CONTRACT—*Notice to Surety—Completion of Work.* Where contractor waived time given him in notice to remedy matter complained of and abandoned the work, his obligee was neither required to wait until the termination of such time to take over the work nor to notify the sureties of his intention so to do.

5. PLEADINGS—*Admissions.* A party is bound by the allegations and admissions of his own pleadings, or of those of another which he adopts.

6. STIPULATIONS—*Effect.* In action on government contractor's bond a stipulation between the creditors and the sureties that the contract or has been ousted from his work by the United States without his fault, is not binding on the United States.

7. CONTRACT—*Modification—Release of Sureties.* Waiver of contractor of time specified in a notice served upon him to comply with certain requirements of the contract did not constitute a modification of the contract so as to release a surety, but was only proof that the contractor refused to proceed further.

8. BANKRUPTCY—*Debts Dischargeable—United States.* Under Bankruptcy Act (Act, Cong. July 1, 1898, Chap. 541, 30 Stat. 544), liability as a surety on a government contractor's bond to the United States is dischargeable.

9. UNITED STATES—*Bond—Separate Action—Obligees.* Under a government contractor's bond given under Act Cong. Aug. 13, 1894, Chap. 280, 28 Stat., 278, the United States and persons supplying the contractor with materials may, upon breach of the bond, maintain separate actions against the sureties.

10. PRINCIPAL AND SURETY—*Interest.* The surety on such government contractor's bond is liable for interest from the time of breach of contract.

11. —— *Discharge of Surety—Payment.* Under a government contractor's bond, where materialmen and laborers and the United States have separate rights and may maintain separate actions on the bond, payment by surety to either one discharges his obligations as to the others to the extent of the payment.

12. TRIAL—*Issues—Findings.* A finding by the court upon an issue it would not permit to be made, is error.

13. BOND—*Contractor—Supplies—Liability of Surety.* Under a bond executed under Act Cong. Aug. 13, 1894, Chap. 280, 28 Stat., 278, in which reference was made to a contract to perform work under the provisions of the "Reclamation Act" (Act June 17, 1902, Chap. 1093, 32 U. S. Stats. at Large, p. 388), the surety is liable for supplies for buildings, dining rooms, furniture, and means of provisioning workers, where the work which would take months to complete, was to be performed many miles from any town.

14. GOVERNMENT CONTRACT BOND—*Separate Action—Postponement.* A cause of action which has arisen upon a government contractor's bond given under Act Cong. Aug. 13, 1894, Chap. 280, 28 Stat., 278, in favor of persons supplying a government contractor with materials in the prosecution of work under the "Reclamation Act" (Act June 17, 1902, Chap. 1093, 32 U. S. Stat. at Large, p. 388), need not wait the outcome of a suit upon the same bond in favor of the United States.

15. UNITED STATES—*Government Contract—Bond—Obligees—Priority.* Under a government contractor's bond which gives individual creditors and the United States independent causes of action, such as a bond, Act Cong. Aug. 13, 1894, Chap. 280, 28 Stat., 278, priorities between individual creditors and such government should be as though between man and man.

*Error to Montrose District Court, Hon. Thomas J. Black,
Judge.*

Messrs. ROGERS, ELLIS & JOHNSON, Mr. PERCY ROBIN-
SON, Messrs. DINES, DINES & HOLME, Mr. K. B. TOWNSEND,
for plaintiffs in error.

Mr. HARRY B. TEDROW, Mr. FRANK HALL, Mr. J. R.
ALEXANDER, Messrs. SMITH, BROCK & FERGUSON, Mr. R. F.
ARMSTRONG, Messrs. SHERMAN & SHERMAN, for defendants
in error.

Mr. Justice White delivered the opinion of the court:

NOVEMBER 21, 1904, The Taylor-Moore Construction
Company, a Texas corporation, hereinafter called the con-
tractor, entered into an agreement with the United States
for the construction of the Gunnison Tunnel as a part of
the Uncompahgre Valley Irrigation Project in this state.
The work was prosecuted under the provisions of "The
Reclamation Act," 32 U. S. Stat. at Large, p. 388. The
contract, by reference, included the advertisement for bids,
the proposals of the contractor, and the specifications for
the work, and obligated the contractor to give a bond, as
required by the Act of Congress of August 13, 1894 (28
U. S. Stat. at Large, p. 278), in the sum of $150,000. There-
upon the contractor caused to be executed and presented to
the Secretary of the Interior, as such bond, the instrument
constituting the basis of this controversy. The instrument
was unusual in form, in that it was composed of seven
different writings, executed by different sets of individual
sureties. Such writings constituted the completed instru-
ment, and each recited the terms and conditions of the bond
in identical language, except that the liability of each surety
was designated separately, and the sum for which each
became liable was less than the full $150,000 penalty
designated in the bond. The following is a verbatim copy
of the body of the instrument executed by sureties Leyner,
Riggs, Elliott and Weigle, to-wit:

"Know All Men by These Presents, that we, The Taylor-

Moore Construction Company, a corporation duly organized under the laws of the State of Texas, and doing business in Hillsboro, County of Hill, and State of Texas, principal, in the sum of one hundred and fifty thousand dollars, and J. Geo. Leyner of the city and county of Denver, and State of Colorado, surety, in the sum of fifteen thousand dollars, and R. L. Riggs of the city and county of Denver, and State of Colorado, surety, in the sum of five thousand dollars, and Jacob J. Elliott of the city and county of Denver, and State of Colorado, surety, in the sum of five thousand dollars ($5,000), and William A. Weigele of the city and county of Denver, and State of Colorado, surety, in the sum of five thousand 00/100 dollars, are held and firmly bound unto the United States of America, each in the sum set opposite its or his respective name, lawful money of the United States, for which payment, well and truly to be made, we, each of us, bind ourselves, our heirs, executors, administrators and assigns, firmly by these presents.

*Sealed* with our seals and *Attested* by our signatures, this twenty-first day of November, in the year of our Lord, one thousand nine hundred and four.

*The Nature of This Obligation Is Such* that, whereas the said principal has entered into a certain contract, as hereinafter recited, and is required thereunder to furnish bond to the United States of America, in the sum of one hundred and fifty thousand dollars, this bond being a portion of the security so required. *Therefore,* if the said The Taylor-Moore Construction Company, its successors and assigns, or any of them, shall, and do, in all things, well and truly observe, perform, fulfill, accomplish and keep all and singular the covenants, conditions and agreements whatsoever, which, on the part of the said The Taylor-Moore Construction Company, its successors and assigns, are, or ought to be, observed, performed, fulfilled, accomplished and kept, comprised or mentioned in certain articles of agreement bearing date the twenty-first day of November, one thousand nine hundred and four, between the said The Taylor-Moore Construction Company and E. A. Hitchcock, Secre-

tary of the Interior, concerning the construction and completion of the Gunnison Tunnel, Uncompahgre Valley Project, Colorado, according to the true intent and meaning of said articles of agreement, and shall promptly make payment to all persons supplying their labor and materials for the prosecution of the work provided for, then the above obligation to be void, otherwise to remain in full force and virtue.

*In Testimony Whereof,* the said The Taylor-Moore Construction Company, as principal, and J. Geo. Leyner, R. L. Riggs, Jacob J. Elliott and William A. Weigele, as sureties, have hereunto subscribed and affixed their seals the day and year first above written."

Each of the several parts of the bond is signed by the principal and the sureties therein named. Each surety justified before a notary public, and either the postmaster or some other Federal officer certified as to his citizenship and financial ability. The several parts of the bond were· introduced in evidence as Exhibit A, and therefrom it appears that the total of the sums for which sureties signed aggregated $155,000, *but in each instrument it was recited that the same was a part of the security in the bond of* $150,000 *required of the contractor.* Three of the several instruments composing the bond were executed in Texas, by sureties residing there; the remaining four were executed by sureties residing in Colorado. In December, 1904, after the execution and delivery of the contract and bond, the contractor entered upon the work, but quit the same on May 26, 1905, at which time it was taken over by the United States. At that time there were several outstanding obligations of the contractor for labor and materials furnished in the prosecution of the work, and supplies furnished the boarding house and commissary department maintained by the contractor near the scene of operation. September 11, 1905, some of such creditors instituted an action in the District Court of Montrose County upon the bond. The contractor and the sureties residing in Colorado were brought within the jurisdiction of the court, but the sureties

residing in Texas were neither served with process nor entered their appearance in the case. March 26, 1906, the United States appeared in the case, specially, and questioned the jurisdiction of the District Court, and surety Weigle thereafter raised the same question by demurrer to the complaint, which was sustained, and the action dismissed. The cause thereupon came to this court on writ of error prosecuted by the plaintiffs in the original suit. Judgment was reversed and the jurisdiction of the District Court sustained. *United States, etc., v. McPhee et al.,* 51 Colo. 425. Early in the year 1912 the United States completed the project, and on March 25th intervened in the case, and thereafter on May 10, 1913, filed its amended petition in intervention, and prayed judgment against the sureties on the bond, by reason of the default of the principal therein in the fulfillment of the aforesaid contract of construction. Prior and subsequent to the last named date, some of the defendant sureties filed joint answers to the complaint, as well as to the petition in intervention, and others filed separate answers. Demurrers were interposed to different pleadings and amended ones filed, and as late as April 1, 1914, a replication to the separate answers of certain sureties was filed by the United States. At this time the United States also presented to the court, and requested permission to file, an answer to the complaint, an answer to the petition in intervention of The Hendrie-Bolthoff Manufacturing & Supply Company, an intervening creditor, and an answer to the petition in intervention of the other intervenors, together with a replication to the answers of the plaintiffs, and certain intervenors to the amended petition in intervention of the United States. The court declined to permit the filing of these pleadings. Counsel agreed upon an order of procedure, to the effect that the questions between the United States, the plaintiffs, and intervening creditors should be deferred until after the question of the liability of the sureties on the bond was determined. Finally, except as aforesaid, all cases were at issue, presenting a three-sided controversy, in which, on

some issues, the United States and the individual creditors have identical interests, and on other issues the interest of the United States is directly opposed to that of the individual creditors.

An agreed statement of facts was entered into between the plaintiffs and the defendant sureties, by which the latter admitted the various claims of the former, but submitted to the court for determination the question of liability of the sureties on the bond. A like stipulation was made between the defendant sureties and the intervening creditors, The Hendrie-Bolthoff Manufacturing & Supply Company, and McPhee & McGinnity Company. The United States, by an instrument filed in this court, admits the same facts. The defense of the sureties was that the bond, after its execution and delivery, had been materially changed by reason of which the sureties were released from liability thereon; that the United States and the contractor, by mutual consent, modified the terms of the contract after the execution and delivery of the bond, and thereby released the sureties from liability to the United States; that the United States wrongfully ousted the contractor, and prevented him from completing the contract. Surety Orman pleaded and relied upon the additional defense of lack of consideration in the execution of the instrument signed by him, and that he had been adjudged a bankrupt, and thereafter discharged in such bankruptcy proceedings from all liability on account of the claim or undertaking sued on.

The case was tried to the court without a jury, and July 7, 1914, findings of fact were made and judgment entered, to which exceptions were saved by the United States, and all the defendant sureties, except Orman. Some of these findings and portions of the judgment which we now desire to consider may be briefly stated as follows: That because the bond recited on its face that it was taken in the sum of $150,000, and the total amount for which the several sureties bound themselves individually totaled the sum of $155,000, it constituted a material change in the bond, rendering it inoperative and void so far as the United States

is concerned, but does not affect its validity as to the creditors who furnished labor, materials and supplies to the contractor; that defendant Orman was relieved of liability on the bond by reason of his discharge as a bankrupt; that each of the several claims presented by the individual creditors was for labor and materials supplied in the prosecution of the work, within the meaning of the Act of Congress of August 13, 1894, and for the payment of which the sureties were liable, together with interest thereon from the date when the suit was filed. Upon the facts so found judgment was entered as follows: Against the United States denying it any relief; against each of the Colorado sureties, except Orman, for the full amount for which he obligated himself in the instrument forming a part of the bond, with interest thereon from the date of the commencement of the suit at 8% per annum; in favor of Orman, discharging him of all liability on the bond; in favor of the individual creditors of the contractors for the full amount of their respective claims, with interest thereon at 8% per annum from the date of the commencement of the suit, to be paid out of the fund collected from the judgment against the sureties, and thereupon such judgment against the sureties to be fully satisfied.

1. The defendant sureties criticise the complaint and the amended petition in intervention of the United States. They assert that the allegations of the different obligees under the same instrument, in respect to the construction of the instrument, are in conflict with each other, and that each of such pleadings contains within itself contradictory allegations or recitals, and that it is uncertain whether the individual creditors treat the alleged obligations of the sureties as liabilities under a bond for $150,000 or $155,000; while the United States in its petition admits that said instruments constitute a bond for $155,000. Such pleadings are subject to criticism, but are not fatally defective when properly considered. The sureties did not, in the trial court, ask the elimination of the objectionable features of the pleadings. The allegations of the complaint charge

that the contractor and sureties executed and delivered to the United States "their joint and several undertakings and bonds in the aggregate sum of $150,000, * * * each in the amount set opposite to his name as sureties," etc., the several sums so set forth aggregating $155,000, and prayed judgment against each surety for the amount for which he obligated himself on the bond. The amended petition of intervention alleges that the contractor, as principal, and each of the other defendants named as sureties, executed and delivered to the United States "their joint and several undertakings and bonds * * * in the aggregate sum of $155,000, each of said sureties entering into said undertakings and bonds to the extent, and in the amount, set opposite to their respective names," and then follows a list of the several sureties, with the amount for which each obligated himself set opposite his name, together with a copy of the bond, in which the penal sum was designated as $150,000. The bond, having been set forth, showed on its face that it was an obligation in the sum of $150,000, and the prior erroneous allegation is technical and neither misled the defendant sureties nor affected their substantial rights.

2. The contention of the sureties, and the finding of the court, that there was a material alteration in the bond after its execution and delivery, have no support in the record. The facts in relation to the entire matter are undisputed. The question involved is, therefore, one of law, not of fact. Every surety had full knowledge of the advertisement for bids, the proposal of the contractor and the specifications for the work, as they were made a part of the construction contract, and the latter instrument, by reference, was embodied in the bond. The contractor was required to "furnish bond in the sum of $150,000 for the faithful performance of the work," with "good and approved security," and each of the seven instruments recites such facts in specific terms and declares that it is "a portion of the security so required." Each surety, with full knowledge of such facts, executed one of the seven instruments

which compose this bond. While each instrument disclosed that the contractor was required to furnish to the United States a bond in the sum of $150,000, with good and sufficient security, and recited that it was to be a part of such security, it disclosed nothing relative to the nature of the other parts. The intent is clear that each surety understood and intended that he should be bound in a designated sum as surety, upon a bond in the sum of $150,000, and by entrusting the inchoate instrument he signed, to the principal, it was an authorization to the latter to validate the same by securing other such parts, complete the bond to the satisfaction of the United States and deliver the same. *Palacios et al. v. Brasher,* 18 Colo. 593, 34 Pac. 251, 36 Am. St. 305; *Butler v. United States,* 21 Wall. 272, 22 L. Ed. 614.

There was no limitation as to the number of sureties or their individual liability, but the total penalty of the completed bond was designated in each instrument as $150,000. Each surety had full knowledge that there were to be other sureties and other like instruments to the one that he signed, sufficient to satisfy the United States. The case is unlike those cited by counsel, where, on the face of the bond, there was a disclosure of the number and personnel of the sureties. In the instant case the United States was at liberty to require any number of sureties, and that each obligate himself to pay the full amount of the bond, or any less sum. In either event the instrument would be a bond in the sum of $150,000, and in the event of the default of the principal therein the obligees could collect from each surety the amount he bound himself to pay until the total of the sums so collected equalled the penalty of the bond, together with any interest properly recoverable; and thereupon the liability to the obligees would cease and the adjustment of the rights and equities among the sureties would be for them to determine. In a bond given by a principal and his sureties there is a primary obligation resting upon the former to which the obligation of the latter is incident. The penal sum designated measures the aggre-

gate liability of all the sureties; and the amount for which each surety binds himself measures his own liability. In the instant case not one of the several instruments constituting the completed bond speaks a different language from that which it spoke at the time it passed from the hands of the surety, and the language of all, taken together, makes certain that the completed bond is for $150,000.

3. The court erred in finding and adjudging that on May 27, 1905, the United States, by its officers and agents, ousted the contractor from the work and prevented its completion under the contract, and thereby discharged the sureties from liability on the contractor's bond. The facts in relation to the matter are undisputed and justify but one conclusion; and that is, that the contractor refused to comply with the contract and voluntarily abandoned the work, and surrendered the same to the United States. The contract (Clause 21 of the specifications) provides that, should the contractor fail to begin work, or delivery of material, or prosecute the work in such manner as to complete the contract within the time limit, etc., "notice thereof in writing shall be served upon him, and upon his neglect or refusal to provide means for a more energetic and satisfactory compliance with the contract within the time specified in such notice, then, and in either case, the Secretary of the Interior shall have the power to suspend the operation of the contract, and he may take possession of all machinery, tools, appliances," etc., and continue the work, etc.

On May 23, 1905, a notice in writing, based upon and in accordance with this provision of the contract, was prepared by the United States, addressed to and served upon the contractor. The notice referred to the aforesaid clause of the contract, and recited that the contractor had agreed to begin work promptly, and within ninety days thereafter to have a force and plant at work sufficient to complete the work required on or before the 15th day of April, 1908, and continued, "the plant and force which you have now on the ground is entirely inadequate to fulfill these conditions, and

you are hereby notified that, unless you comply with the conditions of the contract, within ten days from this date, the Secretary of the Interior will exercise the powers given him in clause 21 of the specifications, and will suspend your contract." May 27th the contractor, by its president, in writing, accepted service of the notice, and waived "the ten days allowed the Taylor-Moore Construction Company (the contractor) within which to comply with" its terms. The notice of acceptance further recited, "Authority is hereby given the United States government, or its authorized agents, to take charge of the work, equipment and material connected with the driving and construction of the Gunnison Tunnel," and was signed in the corporate name of the contractor, by its president. Thereafter, and on the same day, the contractor retired and the United States took over the work and continued the construction of the tunnel.

It is true that the contractor had the full period of time fixed in the notice in which to perform the things therein specified. However, by the terms of the contract, conditions might arise authorizing the United States to suspend the contract and take over the work prior to the expiration of such time. The language of the contract is that upon the contractor's "*neglect* or *refusal* to provide means for a more energetic and satisfactory compliance with the contract within the time specified in such notice," the United States, through a designated agent, may, in either event, suspend the contract. The language of the contract, together with that of the notice, acceptance thereof and alleged waiver of time by the contractor, together with the latter's acts in the premises, will not permit the conclusion that the contractor was unlawfully ousted. On the contrary, it establishes, we think, very clearly that the contractor, immediately upon service of the notice, refused to proceed with the work and abandoned the contract. Under these circumstances, it was neither necessary for the United States to wait the full ten days' time to take over the work nor to notify the sureties of its intention so to do. More-

over, the complaint expressly alleged that the contractor, on or about May 26, 1905, "forfeited, abandoned and gave up said contract, and failed and refused to further proceed therewith, or to comply with and carry out the same, and became insolvent and unable to pay its debts," etc. Other creditors and intervenors, who subsequently became parties to the suit, adopted this allegation of the original plaintiffs. The allegation is binding upon such parties. While the sureties in their answer to the complaint deny this allegation and allege that the contractor was "ousted" and "compelled to involuntarily quit said work," and signed a stipulation with the plaintiffs containing a recital that the contractor was ousted, this does not affect the rights of the United States. Moreover, the facts in relation to the matter are fully set forth in the stipulation, and the legality of the acts constituting the alleged ouster is submitted to the court for determination.

Under the undisputed facts, we conclude that the contractor was not ousted, but voluntarily quit the work and abandoned the contract. One of the claimed modifications of the terms of the contract after the execution and delivery of the bond, so far as relied upon by the sureties, is the waiver by the contractor of the ten days' time he had, after notice served upon him, to provide means for a more energetic and satisfactory compliance with the contract. The fact that the contractor delivered to the United States the written statement of waiver and authority for it to take charge of the work, etc., and the United States did take immediate charge thereof, did not constitute a modification of the contract. It was not an agreement between the United States and the contractor. It was only proof that the contractor refused to proceed further and had abandoned the contract. The taking over of the work by the United States was by virtue of the construction contract.

4. The record discloses that surety Orman filed a petition in bankruptcy in the proper court on January 16, 1908, and was thereafter, on June 25th of the same year, dis-

charged in bankruptcy; that the bond forming the basis of this suit was duly scheduled in the bankruptcy proceedings, and that the United States was served with notice of all such proceedings and steps taken therein. The contention of the United States is that debts due it are not dischargeable in bankruptcy. It is argued by counsel that the question of whether or not a discharge of a debtor under the present bankruptcy act is effective against the United States has not been directly decided by the courts in any reported case. The rule is that, as a sovereign, it is not bound by the general language of a statute, and is not bound by the provision of an insolvency law, unless specifically mentioned therein. *Guarantee Title & Trust Co. v. Title Guaranty & S. Co.*, 224 U. S. 152, 56 L. Ed. 706, 32 Sup. Ct. 457. This case holds that there is a marked distinction between the former act and the present 1898 Bankruptcy Act. It declares that there was a deliberate change of purpose in the new act with reference to debts due the United States, and that § 1, which defines "creditor," affects the United States in its claims. The same declaration is made in reference to several other provisions, including the section providing that a discharge in bankruptcy releases the bankrupt from all of his provable debts, except such as are due as a tax levied by governmental authority. The debt here involved is a provable claim and Congress certainly had such character of debts due the United States in mind when it enacted the section relating to discharge of bankrupts. Section 57J of the Act declares that "Debts owing to the United States, * * * as a penalty or forfeiture, shall not be allowed, except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose, with reasonable and actual cost occasioned thereby, and such interest as may have accrued thereon according to law." The language of the act is explicit. "A discharge in bankruptcy releases the bankrupt from all his provable debts, except such as are due as a tax levied by the United States," etc. The necessary inference from these provi-

sions is that if the United States holds any provable claim against a bankrupt, which is not for a tax, etc., it will be released by his discharge. 1914 Edition, Black on Bankruptcy, § 724; 2d Edition, Brandenburg on Bankruptcy, p. 266.

If Congress found it necessary, as it did, to expressly except taxes due the United States, etc., from the operation of a discharge, it would seem that if it intended that other debts due the United States should be excepted, it would have so declared. The omission of any exception of such debts is significant. The insertion of the provision with respect to taxes, without a like provision in regard to ordinary debts due to the United States, must be attributed to some purpose on the part of the law-making body. The purpose in view, we think, was that a bankrupt should be discharged from provable debts, to whomsoever owed, except as specified. Ascribing this meaning to the language is in keeping with the purpose and spirit of the bankruptcy act. The purpose of such acts, it has been frequently declared, is to relieve the honest debtor from the weight of oppressive indebtedness and to permit him to start afresh, free from the obligations and responsibilities consequent upon business misfortunes. *Burlingham et al. v. Crouse*, 228 U. S. 459, 57 L. Ed. 920, 33 Sup. Ct. 564, 46 L. R. A. (N. S.) 148. The United States, when it engages in business enterprises, should be subject to the same laws and occupy no different position than individuals when so engaged. The judgment in favor of Orman is affirmed.

5. The court held and adjudged that each surety was liable for interest at the legal rate on the amount of his obligation, from the date of the commencement of the action, and the sureties contend that this was error. There is a conflict in the authorities upon the question of allowing interest upon the penalty of a bond. The weight of American authority, however, is in favor of allowing it, and such is the rule in this jurisdiction. *Empire State Surety Company v. Lindenmcier et al.*, 54 Colo. 497, 131 Pac. 437, Ann Cas. 1914 C. 1189. The penalty in a bond

is the amount which the obligors agree to pay, if the whole penalty be needed to satisfy the damages sustained by the obligee by a breach of the bond, and is due as soon as the breach occurs. As said in *Wyman v. Robinson,* 73 Me. 384, 387, 40 Am. Rep. 360:

"If he gets it then, he gets what the contract provides; if he gets it later, he gets less than what the contract provides. If, then, the penalty be paid after the breach, interest should be added for the detention of the penalty, to make it equivalent to a payment at the date of the breach.

After the penalty is forfeited, it becomes a debt due. The sureties then stand in the relation of principles to the obligee, owing him so much money then due. To ascertain the precise sum may require calculation, but that is certain which can be made certain. The rule common to contracts generally applies that where money is due and there is a default in payment, interest is to be added as damages. The defendants should pay damages for detaining the damages which they bound themselves to pay at a prior date. The penalty of the bond is payable because the principal did not fulfill his obligation; the interest is the penalty upon the sureties for not fulfilling theirs."

The sureties make the claim, however, that it was impossible for them to pay the respective sums for which they were liable, because of the danger of double liability; and the further fact that they did not know, and could not ascertain, what proportion of their liability was due to the individual creditors. The bond performs a double function. It is intended to secure to the United States the faithful performance of the contract, and to protect persons from whom the contractor obtained labor or materials in the prosecution of the work. As said in *United States to Use of Anniston P. & F. Company v. National Surety Company,* 92 Fed. 549, 551, 34 C. C. A. 526, 528 (approved in *Equitable Surety Company v. United States, etc.,* 234 U. S. 448, 58 L. Ed. 1394, 34 Sup. Ct. 803): "The two agreements which the bond contains, the one for the benefit of the government, and the one for the benefit of third persons,

are as distinct as if they were contained in separate instruments."

Moreover, it seems that the government and the persons supplying the contractor with materials in the prosecution of the work, in case of default by the contractor, may each maintain a separate action against the sureties in the bond. *United States, etc., v. Perth Amboy S. & E. Co.,* (C. C.) 137 Fed. 689. The act does not postpone the right to have payment, because it may be that a cause of action had also arisen, or may arise, against the sureties in favor of another party for whose benefit the bond was likewise given. If one, so entitled, is paid, the obligation of the surety is discharged to the extent of the payment. Whether there were other, or how many other, creditors secured by this bond, or whether all their claims had been paid, was, under the Act of Congress, of no concern to the sureties in reference to the payment demanded by plaintiffs. The sureties would have been fully protected in the premises by paying the amount for which each was obligated into court, as was done in *United States v. Heaton,* 128 Fed. 414, 63 C. C. A. 156. The action of the court relative to allowing interest is approved.

6. The court held that, as the government did not complete the tunnel earlier than January 1, 1912, and, in fact, could not complete it prior thereto, it should, in justice and right, be precluded from recovering from the sureties on the bond for failure of the principal to comply with the contract, and that the instant case is controlled in that respect by the rules announced in *United States v. O'Brien,* 220 U. S. 321, 55 L. Ed. 481, 31 Sup. Ct. 406, and *United States v. Weisberger,* 206 Fed. 641, 124 C. C. A. 429. The court's action in the premises was error. The question was not at issue, because the court had, as heretofore stated, refused to permit the issue to be made.

7. The contention is made that certain claims were allowed as for labor and material that were not chargeable against the sureties. The bond follows the words of the statute and provides: "That such contractor or contractors

shall promptly make payment to all persons supplying him or them labor and materials in the prosecution of the work provided for in such contract." By § 24 of the contract the contractor was required to furnish the United States engineers and assistants, with meals and camp accommodations, at any camp under his control, showing clearly that it was intended by the contract that such camps should and must be maintained. Indeed, the character, magnitude and location of the work rendered it imperatively necessary that boarding camps be maintained. Section 25 of the contract provides for sanitary and police regulations, and should the contractor fail to enforce them, the United States engineer is empowered to do so and charge the cost to the contractor. Section 52 requires the contractor to furnish lights and necessary facilities, etc.; and Section 54 requires him to furnish warehouses or sheds near the work for storing the cement until used. Sections 56 and 57 provide for the use of broken stone and contemplate the use of crushers and mixing machines; and Section 60 provides for long distance hauling, etc.

In considering the question presented, it is necessary that these matters be kept in mind. For to properly interpret the meaning of the words requiring the contractor to make prompt payment to all persons supplying him or them labor or materials "in the prosecution of the work provided for in such contract," it is essential to look to the contract, the ultimate character of the job to be completed, the location of the work, and the facilities that must be supplied for the doing of it. The labor and material essential in the prosecution of an ordinary job do not measure that which is necessary in the prosecution of the work covered by this contract. Its location was miles away from the habitation of man and the sources of supplies. It was understood that it would take months to complete it, and a large expenditure of money. The United States actually consumed seven years in its completion and expended over $1,000,000 in excess of the contract price.

A stipulation was entered into in relation to the claims

presented. The last clause thereof provides that the question of the liability of the sureties upon the bond sued upon, or interest thereon in case judgment be rendered against them, shall not be affected by the stipulation, and defenses thereto may be interposed. Section 5 of the stipulation is: "That in the prosecution of the work of constructing said tunnel, the said contractor did provide and make use of each and all of the supplies, accommodations, matters and things set forth in the sixth paragraph of plaintiffs' complaint." This paragraph is as follows:

"That in the prosecution of said work under said contract, it became and was necessary for the said contractors to use, furnish and provide material consisting of powder, steel, fuse, hammers, shovels, picks, nails, bolts, piping, and other hardware, merchandise and material, including tools and repairs for the machinery necessary to be used thereon, apartments for the men employed, and cooking, feeding, and sleeping accommodations and apartments, with furniture and implements, and supplies for, food and provisions for the large number of men employed by them, and for the government officials as is required in said contract and specifications, blacksmithing and supplies for the prosecution of said work, coal and fuel for the power and heating plants and cooking and other purposes necessary for the prosecution of said work, to provide and construct buildings and provide all material therefor, to employ and work steam shovels in the excavation of the extensive and deep excavation work to be done under said contract, to provide special clothing for the men at work in the tunnels and in water, to provide teams and outfits therefor, including feed for same, to provide medical attendance and service for the men engaged in such work, to use and provide hay, wood and material for the filling in of holes caused by cave-in of earth and rock in said tunnel work, to use and provide oil, packing and other material for the operation of the machinery and power plants used by them, and to furnish, provide and use various other kinds of material necessary for use in and about the said contract work, all of which

was so used under and in accordance with the provisions of said contract, and of the bonds given in pursuance thereof, and, as plaintiffs are informed and verily believe, are a part of the material necessary for such work, and constitute, are included in and form a part of the labor and material provided for and covered by the said contract and bond, for the prompt payment of which said bonds were given by these defendants."

Section 6 of the stipulation is to the effect that, because of the location and inaccessibility of the work, the contractor was under the necessity of making accommodations, housing and feeding the workmen and supplying them with necessaries while they were at work on the job. By Section 28 it was stipulated that provisions, dining room and kitchen furniture, sleeping apartments and bedroom furniture furnished by the contractor, as shown by bills referred to, were for the purpose of providing food and lodging for the men engaged in the prosecution of the work under the contract in the construction of the tunnel, and "were so used while the men were engaged in such work, and that deductions were made from the amounts due them for labor for the purpose of paying for same." By Section 29 it was stipulated "That upon the taking over of the contract by the United States from The Taylor-Moore Construction Company, the United States took possession and charge of all the kitchen furniture and utensils, dining room furniture and utensils, sleeping rooms, apartments and furniture, also of all the provisions, clothing, tobacco, coal, hardware, and other material not used by said contractors, and refused to return same to plaintiffs, or the parties who furnished same, or any part thereof, and made use of same in the continued prosecution of the work of the construction of said tunnel." By Section 31 it was agreed that the time-checks for labor and services therein shown to have been rendered were rendered under the contract here involved "for the construction of the Gunnison Tunnel."

Under these facts we are unable to say that the trial court was not justified in finding that the various items

composing the several accounts were properly chargeable. The Act of Congress and the bond in the instant case are susceptible of a more liberal construction than the mechanic's lien statutes, and the courts so hold. *American Surety Co. v. Lawrenceville Cement Co.,* (C. C.) 110 Fed. 717, 719. In that case it is said: "The underlying equity of the lien statutes relates to a direct addition to the substance of the subject-matter of the building, or other thing, to which the lien attaches, while the statute in question (being the one here involved) concerns every approximate relation of the contractor to that which he has contracted to do." Indeed, the court, in reaching its conclusion in the instant case, was justified in looking not only to the bond and statute, but also the contract, in ascertaining the items and services, the value of which was properly chargeable against the sureties. The rule applicable was recognized and applied in *United States to Use of Standard Furniture Company v. Aetna Indemnity Company et al.,* 40 Wash. 87, 82 Pac. 171, by the Supreme Court of Washington, where a bond given under the same Act of Congress was before the court. The plaintiff's claim was for the value of furniture in supplying and equipping a light-house built under contract with the United States. The contract and the specifications thereunder required certain furniture for the keeper's residence, and objection was made that the Act of Congress did not contemplate that the bond should apply to or cover the items in question. The court held that, as the contract provided for the furniture, the sureties were liable for its value. In so holding, the court said: "But, were it to be conceded that said furniture was not contemplated by the statute, it was clearly required by the contract, being a part of the subject-matter. The bond was given to secure the faithful performance of said contract and payment to all parties furnishing any material thereunder. Appellants under its contract should be held liable, without regard to any statute, as it has, by said bond, contracted to assume such liability, and there is nothing in said agreement contrary to public policy, nor can any ob-

jection be made to it or its terms requiring it to be held invalid."

8.  An argument has been advanced as to the right of the United States to pro-rate with the laborers and material men in whatever sum the sureties are required to pay. We think the question is not before us for determination. The trial court held that the sureties were not liable to the United States because of the invalidity of the bond. The government was, therefore, eliminated, and there has been no issue or finding between it and the individual creditors as to the distribution of the fund. Moreover, there has been no fund realized that may be distributed. The parties claiming against the sureties are here in an action at law seeking solely a judgment upon their respective claims. The case is unlike those where sureties paid the penalty of the bond into court or assets were marshaled in equity for distribution according to the rights of the parties. The act under which the bond in question was given allows each creditor to bring a separate action for the establishment of his claim. He can sue without respect to the claim of other creditors; and they can sue without regard to his claim, since all have independent causes of action. This is also true as to the government. When the contractor fails to pay for labor and material furnished, a cause of action *instantly* arises upon his bond in favor of such creditors. A cause of action in favor of the government, however, may not arise until the completion of the work. The primary express promise of the contractor was to complete the work by a designated date. An additional agreement was that under certain conditions the government could take over the work and complete the same. Should this be done, a second material promise of the contractor was that after the government had completed the work, "any excess of cost arising therefor over and above the contract price will be charged against the contractor and his sureties, who shall be liable therefor." Such is the language of the contract. Therefore, in the instant case, while a cause of action arose in favor of the individual creditors when their re-

spective claims became due, no cause of action could possibly arise in favor of the government until the work was completed, and it is not claimed that this was done until 1912. It has been held that the government has no priority over an individual creditor in the fund paid into court by a surety on a bond like the one in this case, for the reason the statute has given the government "no such privileged position." As to individual creditors, no such declaration has been made, and the very purpose and object of the statute might warrant the conclusion that by inference individual creditors are placed in such "privileged position." However, if they are not, we are, nevertheless, quite certain that when a question of distribution arises, an equitable rule should be applied, depending upon the facts of each case. The underlying principle that should govern is that the courts are under duty to withhold relief to the sovereign, except upon terms which do justice to the citizen as determined by the jurisprudence of the forum in like subject-matter between man and man. The purposes and objects of the act requiring the bond, the time when different causes of action accrued, or judgments were rendered therein, the relation of the parties to the works constructed, the question of other security, if any, held by the different obligees in the bond, and questions of estoppel, may, in a given case, control.

The record discloses neither legal right nor equitable consideration that requires that these individual creditors should be further delayed in collecting that which has been their due for these many years. Clearly, the fact that the government had an independent cause of action against the same persons, arising some seven years thereafter, is not sufficient. The judgment in favor of the individual creditors against the Colorado sureties, except Orman, is affirmed; the judgment in favor of Orman, discharging him from all liability on the bond, is affirmed; the judgment against the United States in favor of the Colorado sureties, except Orman, is reversed and remanded, and if further

proceedings are had, such parties may amend their pleadings, if they desire.

Judgment affirmed in part and reversed in part.

Chief Justice Hill and Mr. Justice Bailey concurring.